# YOUNIE *v.* STATE OF MARYLAND

[No. 303, September Term, 1973.]

*Decided July 22, 1974.*

The cause was argued before MURPHY, C. J., ▮ and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*William F. Mosner, Assigned Public Defender,* for appellant.

*Gilbert Rosenthal, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *John J. Lucas, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court..

This case reaches us on certiorari to the Court of Special

Appeals after it affirmed the first degree murder and armed robbery convictions of Walter A. Younie (petitioner) in the Circuit Court for Baltimore County. In granting the writ, we limited our review to the following:

"(1) whether the court erroneously permitted an interrogating detective to recite to the jury the fact that the appellant refused to answer certain specific questions, which questions, along with a notation that the defendant refused to answer, were interspersed in a series of admittedly proper questions and answers, and

(2) whether, if error was committed in submitting evidence of the full interrogation to the jury, the error was harmless beyond a reasonable doubt."

In considering these issues, we shall recite only those facts which are required for an understanding and determination of the legal questions involved. If more detail is desired, a fuller description of the events which gave rise to this case may be found in the opinion of the Court of Special Appeals. *Younie v. State,* 19 Md. App. 439, 311 A. 2d 798 (1973).

On December 27, 1971, at approximately 7:30 p.m., Reuben J. Kaufman, an employee of the B & F Liquor Store, was killed by a shotgun blast fired at close range during the course of an armed robbery of that business located on Pulaski Highway in Baltimore County. Eyewitness accounts established the fact that the crime was perpetrated by three individuals who drove from the scene in a dark-colored Cadillac. From this information, the police followed a trail of evidence which eventually led to the petitioner's arrest in Putnam, Indiana. While still incarcerated in that midwestern town, and after being advised of his constitutional rights (*Miranda v. Arizona,* 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966)), which he waived by signing a standardized form, members of the Baltimore County police force questioned the petitioner about this crime. The full extent of this interview, as it was recorded by the police officer in longhand, was signed by Younie at the bottom of each page.

■■■■■■■■

■■■■■■■■

At the trial, over strong defense objection, one of the two police officers who had conducted the custodial interrogation to which we have just referred was permitted to give the following testimony:

> "Q. [By the State's Attorney] Let's start with the questions and answers. Will you read the questions and Mr. Younie's answers to each question to the Court and to the Jury, please?
>
> A. [By witness] On page one:
>
>> 'Q. [By police officer] Are you willing to answer questions reference this armed robbery homicide?
>>
>> A. [By Younie] Some.
>>
>> Q. I show you two mug shots. Who are they?
>>
>> A. No. 73574 John McCormack, Gloucester, Massachusetts. No. 73576 Adelbert Grondin, Hartford, Connecticut.
>>
>> Q. *Did you three pull this armed robbery?*
>>
>> A. *Refused to answer.*
>>
>> Q. Did you go in on the job at the liquor store?
>>
>> A. No.
>>
>> Q. Who drove the car?
>>
>> A. I did.
>>
>> Q. What kind of car?
>>
>> A. Dark blue Cadillac two door.
>>
>> Q. Whose Cadillac?
>>
>> A. Stole it in Quincy, Massachusetts, from in front of a tire store first part of December.
>>
>> Q. Where is this Cadillac now?
>>
>> A. I don't know.
>>
>> Q. Where is it the last time you saw it?
>>
>> A. We left it near a railroad underpass.
>>
>> Q. What did you do to the car?
>>
>> A. John set it on fire.
>>
>> Q. *Whose gun was used?*

A. *Refused to answer.*

Q. *Where is the gun now?*

A. *Refused to answer.*

Q. Was there a girl with you?

A. Well Lorrie Scully left Hartford, Connecticut with us but stayed at the New Motel in Baltimore.

Q. Do you want to talk about the armed robbery homicide?

A. No.

Q. Have you ever seen Lieutenant Roemer and Detective DeMuth before?

A. Yes. At the Greyhound Bus Station in Baltimore on Tuesday, December 28, 1971.

Q. Did the girl Lorrie know there was going to be a holdup?

A. No.

Q. *Did anyone have a gun in the Cadillac?*

A. *Refused to answer.*

Q. Did you buy a gun in Hartford, Connecticut?

A. No.

Q. *Who went in the liquor store?*

A. *Refused to answer.*

Q. Did you shoot anyone in the armed robbery?

A. No.

Q. *Did John McCormack shoot anyone?*

A. *Refused to answer.*

Q. *Did Adelbert Grondin shoot anyone?*

A. *Refused to answer.*

Q. *How much money did you get out of the holdup?*

A. *Refused to answer.*

Q. Walter, do you want us to stop this interview?

A. Yes, I believe I should have an attorney.'

The statement was concluded and dated 1/2/72; time 1425 hours, and it was signed by Walter A. Younie and witnessed by Detective DeMuth and Lieutenant L. Roemer." (emphasis added).[1]

Immediately following this testimony, the original handwritten statement (along with a typed copy of it) was received into evidence, again over the petitioner's objection. Then, at the conclusion of the testimony, over the third and fourth defense objections directed at this evidence, the State was permitted in closing argument to refer to these refusals to respond to some of the officer's questions, and the petitioner's complete statement was given by the trial judge, along with other exhibits, to the jury for it to consider while deliberating. Throughout the trial, as well as on appeal, the petitioner has contended that the reading of those questions to which he did not respond, together with the notation that he "refused to answer" them, was improper. Younie reasons that their deletion from the statement submitted was required by law, and that his request for this should have been granted. He has consistently urged that his silence was a permissible exercise of his privilege against self-incrimination and, since the only purpose the objected to evidence served was to create the highly prejudicial inference that his failure to respond was motivated by guilt, its inclusion was reversible error. We agree.

---

1. Arguably, when Younie indicated he would answer only "some" of the questions, or when he "refused to answer" others or when he said he did not want to talk about the armed robbery homicide, the interrogation should have been terminated according to Miranda v. Arizona, 384 U. S. 436, 473-74 (1966). In a similar situation, the Court of Special Appeals in Law v. State, 21 Md. App. 13, 318 A. 2d 859 (1974) ruled that the continuing custodial interrogation of the appellant there should have ceased when he said, "I don't want to talk anymore" and "I am not going to say any more until I am treated [for my injuries]." However, as this point is not urged here, we shall not pass upon it.

In *Miranda v. Arizona, supra,* the Supreme Court of the United States spelled out in considerable detail the policy which underlies the fifth amendment to the federal constitution.[2] In that landmark case, the Supreme Court, speaking through Chief Justice Warren, stated:

"Thus we may view the historical development of the privilege as one which groped for the proper scope of governmental power over the citizen. As a 'noble principle often transcends its origins,' the privilege has come rightfully to be recognized in part as an individual's substantive right, a 'right to a private enclave where he may lead a private life. That right is the hallmark of our democracy.' *United States v. Grunewald,* 233 F.2d 556, 579, 581-582 (Frank, J., dissenting), rev'd, 353 U.S. 391, 1 L.Ed.2d 931, 77 S.Ct. 963, 62 ALR2d 1344 (1957). We have recently noted that the privilege against self-incrimination—the essential mainstay of our adversary system—is founded on a complex of values, *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55-57, note 5, 12 L.Ed.2d 678, 682, 84 S. Ct. 1594 (1964); *Tehan v. Shott,* 382 U.S. 406, 414-415, note 12, 15 L.Ed.2d 453, 459, 86 S.Ct. 459 (1966). All these policies point to one overriding thought: the constitutional foundation underlying the privilege is the respect a government — state or federal — must accord to the dignity and integrity of its citizens. To maintain a 'fair state-individual balance,' to require the government 'to shoulder the entire load,' 8 *Wigmore, Evidence* 317 (McNaughton rev. 1961), to respect the inviolability of the human personality, our accusatory system of criminal justice demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by

---

**2.** It is no longer subject to question that the fifth amendment is made applicable to the states by the fourteenth. Malloy v. Hogan, 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964).

the cruel, simple expedient of compelling it from his own mouth. *Chambers v. Florida,* 309 U.S. 227, 235-238, 84 L.Ed. 716, 722, 60 S.Ct. 472 (1940). In sum, the privilege is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' *Malloy v. Hogan,* 378 U.S. 1, 8, 12 L.Ed.2d 653, 659, 84 S.Ct. 1489 (1964)." 384 U. S. at 460.

Concerned with both the inherent unreliability which may infest a coerced confession, and the unhealthy tendency which its use creates in making police and prosecutors alike less zealous in the search for independent, objective evidence,[3] the Court in *Miranda* addressed itself specifically to the voluntariness requirement of the fifth amendment. Of particular concern to that Court was its view that custodial interrogation is inherently coercive. In response to this, and in an effort to insure that statements made by an accused while under the control of the police were given in the exercise of a free will, procedural mandates were spelled out which were followed by the caveat that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda, supra* at 444.

The petitioner here does not question that these procedural requirements were complied with and does not allege that the inquisition should have been halted prior to the time when it was. Instead, Younie urges that the State's employment during the trial of those portions of his statement which reflect his silence in response to certain of the interrogator's questions violates both the language and

---

**3.** "Thirteenth century commentators found an analogue to the privilege grounded in the Bible. 'To sum up the matter, the principle that no man is to be declared guilty on his own admission is a divine decree.' Maimonides, Mishneh Torah (Code of Jewish Law), Book of Judges, Laws of the Sanhedrin, c. 18, ¶ 6, 111 Yale Judaica Series 52-53. See also Lamm, The Fifth Amendment and Its Equivalent in the Halakhah, 5 Judaism 53 (Winter 1956)." Miranda v. Arizona, 384 U. S. 436, 459, n. 27 (1966).

the spirit of the fifth amendment mandate as expressed in *Miranda* and its progeny. Our inspection of the case law confirms this contention. In fact, a reading together of three portions of *Miranda* without more provides ample support for the petitioner's argument. They are:

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." 384 U. S. at 473-74.

"Moreover, where in-custody interrogation is involved, there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking his right to remain silent when interrogated." *Id.* at 475-76.

"In accord with our decision today, it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that he stood mute or claimed his privilege in the face of accusation." *Id.* at 468, n. 37.

The last sentiments which we have quoted echoed those expressed in *Griffin v. State of California,* 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965), and have been re-echoed in the decisions of this nation's federal and state appellate courts, including Maryland. For example, the Court of Special Appeals in *Burko v. State,* 19 Md. App. 645, 652, 313 A. 2d 864 (1974) said:

"The Supreme Court recognized, however, that if its holding went no further than to require that an accused be informed of his rights, that the exercise of those rights could, and in many cases possibly would, be used as a weapon for the prosecution. To

allow the police to make an accusatory statement to one who had elected to remain silent and then to permit the police to testify that when the defendant had been accused he did not answer, would have a devastating effect upon the defense. Such tactics, if allowed, would have cloaked the precepts of *Miranda* in an armor of gauze."

In *Commonwealth v. Haideman,* 449 Pa. 367, 296 A. 2d 765, 767 (1972), it was stated:

"The difference between prosecutorial use of an accused's silence at *trial* and the use of an accused's silence at time of *arrest* is, as one court stated, 'infinitesimal.' *Gillison v. United States,* 130 U.S. App. D.C. 215, 399 F.2d 586, 587 (1968). In both instances, the defendant's silence is exploited as evidence of guilt. As the Fifth Circuit observed, '[w]e would be naive if we failed to recognize that most laymen view an assertion of the Fifth Amendment privilege as a badge of guilt.' *Walker v. United States,* 404 F.2d 900, 903 (5th Cir. 1968). It is clear that '[t]he privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury.' *Slochower v. Board of Higher Ed. of N.Y.,* 350 U.S. 551, 557, 76 S.Ct. 637, 641, 100 L.Ed. 692 (1956)."

And, in *Anderson v. State,* 197 Ark. 600, 124 S.W.2d 216 (1939), quoted with approval in *Kagebein v. State,* 496 S.W.2d 435, 438 (Ark. 1973), the Arkansas Supreme Court opined:

"If silence in such a case is evidence of guilt, then one charged with crime must, under penalty of himself creating most damaging evidence against himself in support of the charge, enter into a controversy of words with every idle straggler who may choose to accuse him to his face."

A Michigan appellate court in *People v. Severance,* 43 Mich. App. 394, 204 N.W.2d 357, 359 (1972) wrote:

"The rule is now firmly established that the prosecution may not use at trial the fact that a defendant exercised his privilege of silence in face of accusation, for such would penalize the defendant for exercising the privilege."

Finally, the Ninth Circuit in *Fowle v. United States,* 410 F. 2d 48, 54 (9th Cir. 1969) expressed these thoughts thusly:

"We simply cannot adopt an interpretation of the Fifth Amendment under which one exercising his right to remain silent upon and immediately after his arrest — a right which the Supreme Court has so earnestly sought to guarantee and preserve — is severely prejudiced by his recourse to that cherished right. It would be anomalous indeed if honorable law enforcement officers were required to elaborate upon the traditional fifth amendment warning and advise arrested persons, in effect: If you say anything, it may be used against you. You have the constitutional right to remain silent, but if you exercise it, that fact may be used against you."

*Accord, United States v. Matos,* 444 F. 2d 1071 (7th Cir. 1971); *Baker v. United States,* 357 F. 2d 11 (5th Cir. 1966); *Fagundes v. United States,* 340 F. 2d 673 (1st Cir. 1965); *Galasso v. State,* 207 So. 2d 45 (Fla. Dist. Ct. App. 1968); *People v. Lampson,* 129 Ill. App. 2d 72, 262 N.E.2d 601 (1970); *State v. Dearman,* 198 Kan. 44, 422 P. 2d 573 (1967), *cert. denied,* 396 U. S. 895, 90 S. Ct. 194, 24 L.Ed.2d 173 (1969); *State v. Roberts,* 208 N.W.2d 744 (Minn. 1973); *State v. Beck,* 289 Minn. 287, 183 N.W.2d 781 (1971); *People v. Abdul Karim Al-Kanani,* 26 N.Y.2d 473, 311 N.Y.S.2d 846, 260 N.E.2d 496 (1970).

In urging that the receiving into evidence of the petitioner's "statement" in its entirety was proper, the State initially stresses that since Younie's silence was surrounded by interrogatories to which he did respond, all of the law we

have just cited is inapplicable. Apparently, the State's contention is that once the petitioner waives the protection afforded an accused by the fifth amendment, he must affirmatively assert his privilege to recover its protection rather than choose to simply remain silent. This argument is an extrapolation from the rule stated by this Court in *Miller v. State*, 231 Md. 215, 218, 189 A. 2d 635 (1963) that

> "It is generally held that if a statement is made by another person in the presence of a party to the action, be it civil or criminal, containing assertions of facts which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak is circumstantial evidence that he believes the statements to be true, and his conduct is thus receivable against him as an admission of such belief."

Underlying this principle is the assumption that human nature is such that it spurs an innocent man to promptly deny false statements made in his presence. However, what is either ignored or overlooked in attempting to superimpose this rule upon silence which occurs during the course of custodial interrogation, is the Constitution which expressly permits the innocent and guilty alike to remain mute and not have this made known to the trier of facts. Silence in the context of a custodial inquisition is presumed to be an exercise of the privilege against self-incrimination from which no legal penalty can flow, and the State has the heavy burden of demonstrating by clear and convincing evidence that a failure to respond was not an invocation of this right. *Cf. Miller, supra* at 218.

Turning now to the evidence in this case, all that is present in the record indicates that Younie was in fact relying upon his right to remain silent rather than waiving it when he failed to answer the police officer's interrogatories. In the first place, the petitioner stated at the outset of his interrogation that he would agree to answer *only "some"* of the questions. In addition to this, since the words of the statement "refused to answer" concededly were

those of the interrogator and not of the accused, it is impossible to determine exactly how he did respond.[4] Since a waiver of this constitutional right to be effective must be clearly and intentionally made, and since silence, even in the face of incriminating accusations, statements, or questions, is inaction and therefore difficult to draw an inference from, in a situation such as this where it is uncertain as to what occurred, we must assume that the peitioner's failure to answer was an invocation of his fifth amendment privilege. We agree with the Court of Special Appeals when it said in *Duckett v. State*, 3 Md. App. 563, 578, 240 A. 2d 332 (1968) that "[a]s the [petitioner was] then in police custody, the admission of evidence calculated to show that [he] stood mute in the face of such accusation would, of course, have been clear error."

Perhaps it is with foresight that the State chose to argue in the alternative that if it was error to permit these questions and the petitioner's silence to come to the jury's attention, then this error was harmless beyond a reasonable doubt. However, in light of the decisions of the Supreme Court it is impossible for us to agree with this contention. That Court in *Chapman v. California*, 386 U. S. 18, 21, 87 S. Ct. 824, 17 L.Ed.2d 705 (1967) held, "[w]hether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied." In that same case, the Supreme Court then proceeded to announce the test for determining whether a federal constitutional error was harmless. This test was restated in *Harrington v. California*, 395 U. S. 250, 251, 89 S. Ct. 1726, 23 L.Ed.2d 284 (1969):

> "We held in *Chapman v. California* [citation omitted], that 'before a federal constitutional error can be held harmless, the court must be able to

---

4. Younie's signature on the statement, we think, does not indicate that he adopted the police officer's words, but only demonstrates his agreement that he did not answer.

declare a belief that it was harmless beyond a reasonable doubt.' [citation omitted]. We said that, *although 'there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error'* [citation omitted], not all 'trial errors which violate the Constitution automatically call for reversal.'" (emphasis added).

Whether the error was harmless beyond a reasonable doubt, the Court continued, is to be based on an independent "reading of the record and on what seems . . . to have been the probable impact . . . [of the tainted evidence] on the minds of an average jury." *Id.* at 254. In *Schneble v. Florida,* 405 U. S. 427, 432, 92 S. Ct. 1056, 31 L.Ed.2d 340 (1972), a case following *Harrington* and which also dealt with a violation of a defendant's right to confrontation as discussed in *Bruton v. United States,* 391 U. S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968), the Court, though it quoted the language of *Harrington,* rephrased the harmless error rule in holding that constitutional error would not be held harmless if "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." However, this rephrasing, we think, has no substantial significance in our disposition of this case because "[t]here is little, if any, difference between . . . [asking] 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U. S. at 24. What is of importance, from an examination of the cases which discuss harmless error, is the realization that if the error goes to a substantial constitutional right (*e.g.* right to counsel — sixth amendment, right not to self-incriminate — fifth amendment) then unless the State can prove beyond a reasonable doubt, as the prosecution did in *Milton v. Wainwright,* 407 U. S. 371, 92 S. Ct. 2174, 22 L.Ed.2d 1 (1972) (where an invalid confession accompanied three valid ones and other substantial evidence of guilt), that

a tainted confession *in no way influenced the verdict* such that the defendant would undoubtedly have been found guilty even if that evidence had not been received, its employment will always be error. Conversely, if the State can show beyond a reasonable doubt that the violation was technical in nature, as well as that the erroneously admitted evidence was merely cumulative, and that there was other overwhelming and largely uncontroverted evidence properly before the trier of fact, then the error would be harmless. *Brown v. United States*, 411 U. S. 223, 93 S. Ct. 1565, 36 L.Ed.2d 142 (1973) (concerned with a *Bruton* violation). See also annotation to *Schneble v. Florida, supra*, contained in 31 L.Ed.2d 921.

Turning now specifically to this case, it is readily ascertainable that we are concerned with a violation of two of the petitioner's fundamental constitutional rights — the protections afforded him by the fifth and sixth amendments. From the language of *Miranda*, "It is now axiomatic that the defendant's constitutional rights have been violated if his conviction *is based, in whole or in part, on an involuntary confession,* regardless of its truth or falsity. [citations omitted] This is so *even if there is ample evidence aside from the confession to support the conviction* . . . ." 384 U. S. at 464, n. 33 (emphasis added). After reviewing the record in this case, we are not convinced beyond a reasonable doubt that the tainted confession in no way influenced the jury's verdict. Since Younie chose not to testify in the case, besides his statement made in the Putnam, Indiana jail and other evidence which proved little more than that a murder had been committed by three men, the State is left only with the testimony of Lorrie Scully Dwire, the Lorrie Scully referred to in Younie's statement. Concededly, her testimony, if believed by the jury, that the petitioner "told me they did rob the place and that the man had been shot and that he had shot him" certainly implicates Younie. However, the correctness of this witness' testimony was not left unquestioned and her credibility was subjected to a substantial attack by Younie's counsel. On cross-examination the defense elicited from this witness an

admission that she had a history of drug use and promiscuity as well as that she had on a number of occasions been a patient in a mental institution. In addition to this, the defense demonstrated the existence of factors which might very well have motivated her to incriminate the petitioner. First, Mrs. Dwire admitted that she was "not very happy" with Younie because he had claimed that the two of them had been sleeping together. Second, having agreed with defense counsel that she had suicidal tendencies which were precipitated by involuntary confinement, Mrs. Dwire also conceded that she was appearing as a witness at the trial to fulfill a deal with the State that the charges against her of acting as an accessory after the fact to the crime of murder would be dropped, and she would be released from confinement in return for her testimony. Obviously, because of this attack on the credibility of its chief witness, the State was hopeful of buttressing her testimony. Pursuant to this, the assistant state's attorney not only insisted upon the introduction into evidence of this tainted confession, but referred to it on multiple occasions. The State's contention that it desired to have the tainted evidence come to the jury's attention merely to place the concededly proper portion of the confession in some form of comprehensible context demonstrates that it was not harmless error to admit it. This is so, as the good evidence standing alone must be sufficient to convict, and we must be convinced beyond a reasonable doubt that the jury was in no way influenced by the bad. The harmless error rule, as it pertains to the fifth and sixth amendments, has been and should be carefully circumscribed for the reasons given in *People v. Jablonski,* 38 Mich. App. 33, 38-39, 195 N.W.2d 777, 780 (1972), where it is said that:

> "Continued expansion of the harmless error rule will merely encourage prosecutors to attempt to get such testimony in, since they know that, if they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal."

Accordingly, we hold that the error committed here was not harmless beyond a reasonable doubt and reverse the petitioner's conviction.

*Judgments of the Court of Special Appeals and the Circuit Court for Baltimore County reversed, and the case remanded for a new trial.*

*Costs to be paid by the County Council of Baltimore County.*