477 A.2d 797

**Ira TOLEN**

v.

**STATE of Maryland.**

**Joe Louis ANDREWS**

v.

**STATE of Maryland.**

**Nos. 1514, 1536, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

July 13, 1984.

Mark Colvin, Asst. Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellants.

Richard B. Rosenblatt, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Arthur A. Marshall, Jr., State's Atty., and John F. Breads, Jr., Asst. State's Atty., Prince George's County, on the brief, for appellee.

Submitted before MOYLAN and LISS, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

MOYLAN, Judge.

As an appellate contention, the claim that evidence was unconstitutionally "suppressed" is enjoying a season in high fashion. This decision, and the Supreme Court opinion upon which it is based, will hopefully reduce that vogue.

The appellants, Ira Tolen and Joe Louis Andrews, were convicted by a Prince George's County jury, presided over by Judge Howard S. Chasanow, of first-degree rape and second-degree rape, respectively. Upon this joint appeal, both appellants raise the following two contentions:

1) That the State denied them due process of law when it failed to preserve the blood and fluid specimens taken from the body of the prosecutrix; and

2) That the trial judge abused his discretion when he failed to grant a new trial on the basis of newly discovered evidence.

The appellant Tolen alone raises two additional contentions:

3) That the trial judge erroneously refused to order a physical examination of the rape victim; and

4) That the trial judge unduly restricted the cross-examination of the rape victim.

The appellants do not, and in good conscience could not, claim that the evidence was not legally sufficient to sustain the convictions. The rape victim was 19 years of age. On December 6, 1982, she was waiting at a bus stop in Washington, D.C., when the two appellants pulled up in an

automobile. She recognized the appellant Andrews, who asked her if she wanted a ride. She accepted. The appellant Tolen was "passed out" in the back seat. Andrews explained to the victim that he was going to take Tolen home. When the three reached an apartment complex in Prince George's County, the appellants forced the victim from the car into a basement apartment.

Inside the apartment, the victim was ordered to disrobe. She was raped by Tolen, with Andrews remaining in the bedroom during the course of the rape. Moments later, someone knocked on the apartment door. The rape victim agreed to answer the door and to state that she was Tolen's girlfriend and that the two of them had been arguing. When she answered the door, however, she ran out and "hysterically" reported to the police officer and maintenance man at the door that she had been raped. She was shortly thereafter taken to the Prince George's General Hospital and examined.

Her story was well corroborated by no less than three neighbors. Bryant Barbee testified that at about 7 p.m. he heard "some beating and noises" in the apartment next door. About 15 minutes later, he saw another neighbor, Mrs. Palmer, come out and threaten to call the police if the noise did not stop. Both Thomas Palmer and Donna Palmer, husband and wife, testified that they called the police when they heard "high pitched" and "stressful" screams "apparently coming from the hallway." When they stepped in the hallway to investigate, they saw the appellant Tolen struggling with a woman. In response to the call from the Palmers, the police knocked on the door to Tolen's apartment at 7:04 p.m. When no one answered, the officer left. He returned later, however, and contacted the maintenance man. When he knocked on the door the second time, at about 8:13 p.m., the rape victim ran out and reported the rape. The responding officer, James Nowlin, described her as "hysterical" and "nervous" but testified that she did not appear to be intoxicated. Both Mr. and Mrs. Palmer, as

well, observed the rape victim rush out of Tolen's apartment when the officer returned on the second occasion.

Dr. Elias Gerth examined the rape victim at 10 p.m. that evening at the Prince George's General Hospital. Her face was swollen and bruised and there was a small laceration on the right side of her nose. He, however, found no clear evidence of genital trauma. Dr. Gerth testified that the rape victim's blood was not tested for the presence of alcohol and that such tests are not normally conducted.

Both of the appellants took the stand and acknowledged having been at the apartment with the rape victim. Both appellants testified as to an act of sexual intercourse between the rape victim and Tolen. Their mutual defense, however, was that the act of intercourse was completely consensual. They testified that the victim had had several drinks. The rape victim, on the other hand, testified that she took only "two swallows" of liquor in the apartment and was "not intoxicated at all." The maintenance man who went to the door with the policeman testified that the victim smelled of alcohol and that her speech was slurred. One of the neighbors testified that she "looked like she had been drinking" and that her eyes were "blurry." The two appellants, moreover, testified that after the act of intercourse, the victim asked Tolen for money twice and for drugs two or three times.

The appellants now contend that the routine destruction by the hospital of the victim's blood specimen denied them due process in that it denied them the opportunity to prove that the victim was either 1) under the influence of alcohol at the time of the alleged rape or 2) a user of drugs.

With respect to the blood specimen (it is not even suggested how the preservation of the fluid specimen would have been material), the Rape Crisis Center of the Prince George's General Hospital is not an arm of the prosecution. It was stipulated that specimens such as those taken in this case are "routinely" destroyed by the hospital staff ten days after they are taken. In ruling on the appellants'

pretrial motion to have the indictment dismissed, Judge Chasanow found as a matter of fact:

"[T]he evidence was clearly, it was destroyed as a routine part of the practice of the hospital by an independent, private facility. Admittedly, the Rape Crisis Center is part of the hospital and there is an intimate contact with the police department. However, I don't feel the routine destruction of specimens in any way should result in dismissal of the charges."

Under circumstances such as these, even to raise the spectre of unconstitutional suppression betrays either 1) a total failure to comprehend or 2) a stubborn refusal to comprehend the limited applicability of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny. The heart of the *Brady* decision was that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1196. In explicating *Brady, Moore v. Illinois,* 408 U.S. 786, 794–795, 92 S.Ct. 2562, 2567–2568, 33 L.Ed.2d 706, 713 (1972), pointed out the three distinct components, all of which are necessary to the finding of a due process violation:

"The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. These are the standards by which the prosecution's conduct ... is to be measured."

In measuring the situation at bar, against this "tripartite standard stated in *Moore*," *Tobias v. State,* 37 Md.App. 605, 626, 378 A.2d 698 (1977), the appellants' contention does not come remotely close to satisfying any one of these criteria, let alone all three.

Even if we were to characterize the routine nonpreservation of medical specimens as "suppression," the routine destruction was not at the hands of the prosecution or the police but was an accepted hospital administrative procedure. It is significant, moreover, that the destruction of the specimens did not occur "after a request by the defense" for their preservation or a right to examine them. In a situation far more favorable to the defense than the one here, it was nonetheless noted in *Tobias v. State, supra,* at 37 Md.App. 629, 378 A.2d 698:

> "It is important to note, however, that, for all practical purposes, the photograph in question may be deemed to have been 'lost,' and thus became unavailable, *before the request for its production was made.*" (Emphasis supplied).

In terms of what is "suppression," moreover, *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976), characterized *Brady* as involving "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense." What the unanalyzed blood specimen in this case might have revealed was no more known to the State than it was to the defense. There is no remote suggestion that the State feared what the undone analysis might have revealed and, therefore, deliberately chose not to know.

Before a finding can be made that there has been an unconstitutional suppression, furthermore, there must be a subfinding as to "the evidence's favorable character for the defense." *Moore v. Illinois,* 408 U.S. at 794–795, 92 S.Ct. at 2567–2568. We have no way of knowing whether the unanalyzed blood sample, even in a peripheral way, would have been favorable to the defense or not. In pointing out that mere uncertainty or speculation as to the quality of the "lost" evidence does not satisfy the rigorous requirements for a finding of unconstitutionality, *United States v. Agurs, supra,* at 427 U.S. 109–110, 96 S.Ct. 2400–2401, pointed out:

> "The mere possibility that an item of undisclosed information might have helped the defense, or might have affect-

ed the outcome of the trial, does not establish 'materiality' in the constitutional sense."

■ It is also required that the evidence in question be material. Generally speaking, this requires that the evidence be directly exculpatory and not of mere utility for impeachment purposes. As the Court of Appeals pointed out in *State v. Giles*, 239 Md. 458, 469, 212 A.2d 101 (1965), *vacated on other grounds*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967):

"Not only must the evidence withheld be admissible and useful, but it must be such, if it had been offered in evidence, as would be capable of clearing or tending to clear the accused of guilt—*i.e.*, it must be exculpatory."

Even if the blood specimen had been preserved and even if an analysis of that blood specimen had shown that the rape victim was mildly or greatly intoxicated, that fact would not have exculpated the appellants. Interwoven with his findings that the appellants had available other modes of proving the intoxication they posited, were Judge Chasanow's findings that the lost evidence in question, even if it had been favorable to the appellants, would only have gone to the peripheral issue of impeachment rather than being directly exculpatory:

"Certainly, the defense feels the specimens and the exact content might have some value. However, it is not as if this was again exculpatory. It would be impeachment evidence, and secondly, there is ample other testimony available, including physicians, nurses, other people, police that examined the victim that would be in a position to perhaps almost as accurately as a blood test, disclose whether in fact the victim was suffering from the effects of alcohol or some other intoxicating substance. So again, because it was part of a routine and not totally unreasonable policy of destroying samples by an independent agency, because the evidence is not directly exculpatory, at least according to *Tobias*, it doesn't go directly to guilt or innocence, although again it may have something to do with impeachment value."

Once again, *United States v. Agurs, supra,* at 427 U.S. 112–113, 96 S.Ct. 2401–2402, has provided a clear statement as to this materiality standard, even assuming that the other two necessary conditions for a finding of suppression have been satisfied:

"The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial."

*See also Younie v. State,* 19 Md.App. 439, 459–461, 311 A.2d 798 (1973), *rev'd on other grounds,* 272 Md. 233, 322 A.2d 211 (1974); *Ross v. Warden,* 1 Md.App. 46, 227 A.2d 42 (1967).

■ Fatal, therefore, to the appellant's claim that there was an unconstitutional suppression of evidence are our conclusions that 1) the State (prosecution or police) did not suppress or destroy anything; 2) nobody destroyed evidence following a defense request for its preservation; 3) there is no way of knowing or even surmising that the evidence would have been favorable to the defense; and 4) even assuming a favorable character to the defense, the evidence would not have been material, in that it had, at best, a peripheral utility for impeachment purposes and was not directly exculpatory.

The narrow issue before us, moreover, is the propriety of Judge Chasanow's pretrial ruling that the indictments not be dismissed. Nowhere in the growing corpus of suppression cases, even where all of the criteria have been satisfied, is the dismissal of charges called for. At most, the defendant is awarded a new trial at which the exculpatory

evidence, earlier suppressed, may be introduced in his defense. As we pointed out in *Powell v. State,* 16 Md.App. 685, 692, 299 A.2d 454 (1973):

"Although there is authority that an accused who is prejudiced by reason of the suppression of exculpatory evidence can obtain a new trial, we are aware of no authority which says he is entitled to an acquittal."

A pretrial dismissal of charges would certainly be the functional equivalent of an acquittal.

Fortunately, such protracted and detailed analysis as that we have just undertaken will no longer be necessary to dispose of "suppression" claims as patently inappropriate as the one at bar. On June 11, 1984, the Supreme Court decided the case of *California v. Trombetta,* — U.S. —, 104 S.Ct. 2528, 81 L.Ed.2d 413. *Trombetta* starkly reminded us of how far we have wandered from the true due process concerns that animated *Brady* and the early decisions that came in the wake of *Brady.* At work has been the largely imperceptible process of slow but steady accretion so aptly described by Judge Henry J. Friendly in his now classic article, *The Bill of Rights As a Code of Criminal Procedure,* 53 Cal.L.Rev. 929 (1965). Judge Friendly there criticized "the domino method of constitutional adjudication ... wherein every explanatory statement in a previous opinion is made the basis for extension to a wholly different situation." *Id.* at 950.

The initial concern was that a vindictive prosecutor not deliberately suppress evidence, known to him but unknown to the defense, that would prove the innocence of the defendant or significantly lower the level of blameworthiness of that defendant for sentencing purposes, following a defense request for such information. From this evolved an affirmative duty to reveal such clearly exculpatory evidence even in the absence of a defense request. Building upon those principles, the cases began to consider suppression not only by the prosecutor but by the police, then the negligent loss of exculpatory evidence following a defense request for its production, and sometimes the negligent loss

of such evidence even prior to a request for production. Some of the case law expanded directly exculpatory evidence to include evidence that would significantly impeach a key State's witness. The contentions, if not the cases, began to argue for evidence of even an unknown quality that might have some utility for the defense. Each expansion, initially an outer limit, soon became a new point of departure as we applied to each new set of facts not the due process clause, nor even *Brady v. Maryland,* but rather the third and fourth generation spinoffs from the more fundamental propositions. As exhilarating as it may be for defense contentions to soar ever upward from third and fourth generation orbits, they need reminding periodically that their feet still must rest on the elemental clay of the due process clause. After twenty years of "the domino method of constitutional adjudication," a unanimous Supreme Court in *Trombetta* has brought us back sharply to the constitutional point of departure.

Citing *Brady v. Maryland, supra,* and *United States v. Agurs, supra,* the Supreme Court opinion begins with the fundamental proposition that the Fourteenth Amendment "requires the State to disclose to criminal defendants favorable evidence that is material either to guilt or to punishment." In considering the possible expansion of that principle, it states the issue for decision precisely, "This case raises the question whether the Fourteenth Amendment also demands that the State preserve potentially exculpatory evidence on behalf of defendants." It answers that question with an emphatic, "No."

The defendants in the *Trombetta* case had all been stopped at various times on California highways. They were all subjected to, on suspicion of drunken driving, an Intoxilyzer Test, which in each case showed the defendant to be presumptively intoxicated. Each defendant sought to suppress the results of the Intoxilyzer Test on the ground that the arresting officers had failed to preserve the samples of their breath and, thereby, made it impossible for them to impeach the test results by having defense experts

conduct their own tests. The Supreme Court made it very clear that the breath samples could have been preserved if the California law enforcement policy had chosen to do so, "Although preservation of breath samples is technically feasible, California law enforcement officers do not ordinarily preserve breath samples and made no effort to do so in these cases."

Let it be noted initially that the California defendants were not pressing, as are the appellants here, for so extreme a sanction as the dismissal of charges. They were merely urging the suppression of the test results on the limited ground that the State should not have been permitted to use the test results against them in a case where the State's destruction of the breath samples had made it impossible for them to have defense experts conduct their own independent tests of the samples.

The California Court of Appeal ruled in favor of the defendants. Its ruling was based upon the decision of the California Supreme Court in *People v. Hitch,* 12 Cal.3d 641, 117 Cal.Rptr. 9, 527 P.2d 361 (1974). There, the California Supreme Court had read *Brady v. Maryland, supra,* and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), expansively, even as the appellants here would have us read the case law expansively, and "concluded that the Due Process Clause is implicated when a State intentionally destroys evidence that might have proved favorable to a criminal defendant." *Trombetta,* at n. 5. *Trombetta* characterized the *Hitch* decision as "noteworthy in that it extrapolated from *Brady*'s disclosure requirement an additional constitutional duty on the part of prosecutors to preserve potentially exculpatory evidence." *Id.* Following a denial of certiorari by the California Supreme Court, the Supreme Court of the United States granted certiorari and flatly reversed the California Court of Appeal.

*Trombetta* looked initially for guidance to *Killian v. United States,* 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), the one earlier Supreme Court decision that had "discussed due process constraints on the Government's

failure to preserve potentially exculpatory evidence." In *Killian*, the petitioner had been convicted of giving false testimony. A key element of the Government's case was an investigatory report prepared by the FBI. The Government conceded that the FBI agents who prepared that report had destroyed the preliminary notes they had made while interviewing witnesses. The defense claim was that the notes would have been helpful to the defense and that the agents had violated the Due Process Clause by destroying "this exculpatory evidence." In denying the claim, the Supreme Court held, at 368 U.S. 242, 82 S.Ct. 308:

> "[I]t seems appropriate to observe that almost everything is evidence of something, but that does not mean that nothing can ever safely be destroyed. If the agents' notes of Ondrejka's oral reports of expenses were made only for the purpose of transferring the data thereon to the receipts to be signed by Ondrejka, and if, after having served that purpose, they were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right."

In finding the *Trombetta* case in "many respects ... reminiscent of *Killian*," the Supreme Court noted that the destroyed evidence would, at best, have not been directly exculpatory but only of utility for impeachment purposes, "As the petitioner in *Killian* wanted the agents' notes in order to impeach their final reports, respondents here seek the breath samples in order to challenge incriminating test results...." In holding squarely that there was no violation of the due process clause, the Supreme Court first noted with significance the absence of any bad faith on the part of the law enforcement authorities:

> "To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny. In failing to preserve breath samples for respondents, the officers here were acting 'in good faith and in accord with their normal

practices.' *Killian v. United States, supra,* at 242 [82 S.Ct. 308]. The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence."

In holding that "California's policy of not preserving breath samples is without constitutional defect," the Supreme Court stressed the rigorous requirements in this regard of "constitutional materiality":

> "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see *United States v. Agurs,* 427 U.S., at 109–110 [96 S.Ct., at 2400–2401] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

Even as Judge Chasanow noted in the present case that other evidentiary avenues were available to show the possible intoxication of the rape victim, so too did the Supreme Court note in *Trombetta,* "Even if one were to assume that the Intoxilyzer results in this case were inaccurate and that breath samples might therefore have been exculpatory, it does not follow that respondents were without alternative means of demonstrating their innocence."

Although conceding that "the preservation of breath samples might conceivably have contributed to respondents' defenses," the Supreme Court held unequivocally that "the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis tests at trial." *A fortiori,* the due process clause does not require the preservation of blood samples in order to go forward with prosecutions for rape.

■ The remaining contentions will not detain us long. Both appellants contend that Judge Chasanow abused his discretion in refusing to grant a new trial on the basis of

newly discovered evidence. The source of the "newly discovered evidence" was one Hazel Buchanan, who was located by the defense five weeks after the trial. The thrust of the proffer as to her evidence was that, years before, she had gone to junior high school with the rape victim in this case. She characterized the rape victim, during those junior high school years, in the following terms:

"She was pretty wild. She used to fight a lot with other girls. I've seen her smoke reefer before. I also seen her smoke PCP before."

Applying the standards enunciated in *Angell v. Just*, 22 Md.App. 43, 321 A.2d 830 (1974), and *Jones v. State*, 16 Md.App. 472, 298 A.2d 483 (1973), Judge Chasanow was not persuaded that this new "evidence would probably produce an acquittal upon retrial." That conclusion was not remotely an abuse of discretion.

■ The appellant Tolen alone contends that Judge Chasanow erroneously refused to order a physical examination of the rape victim. The contention is preposterous. When Tolen learned that the blood sample taken from the victim was no longer available, he requested the court to order a physical examination of the victim in order to test her blood for the presence of alcohol or drugs. It is to be noted that this request came months after the day of the crime. Any analysis of her blood made months later would have been utterly irrelevant on the issue of her possible intoxication on the day of the crime. The only thing that an analysis conducted months later could have revealed would have been the presence of alcohol or drugs in her blood at that later time, and that would be utterly immaterial.

■ The appellant Tolen alone raises the final contention that Judge Chasanow abused his discretion in unduly restricting his cross-examination of the rape victim. The cross-examination of the rape victim, in pertinent part, went as follows:

"Q. When you were picked up by these two gentlemen, you asked these two gentlemen if they used drugs, didn't you?

A. No.

Q. Do you use drugs?

A. No."

An objection followed by the State, which was sustained. Nonetheless, there was no request for an instruction to the jury to disregard the answer. The rape victim responded under oath that she was not a drug user. At the hearing on the motion for a new trial, moreover, Judge Chasanow made it clear that he was ready to permit the defense to probe the subject of the rape victim's use of drugs "around the time of the offense" but that he would not permit a roving inquiry into her life history in that regard. The failure of the cross-examination was in not relating the question to the date of the incident.

■ Later in the same cross-examination, the rape victim was asked whether her boyfriend was a drug user. The State's objection to this question was sustained. At the hearing on the motion for a new trial, Judge Chasanow explained more fully his reasoning in thus restricting the cross-examination:

"What I meant to cut you off on and did cut you off on, if an appellate point, you certainly preserved it, is whether or not you could introduce the fact that her boyfriend was an admitted drug user.

I think you had ample evidence that was the case. I felt that was so remote and certainly there are some questions that are so if not degrading, embarrassing, humiliating, but so remote on weighing approach, the interest of the witness to be free from undue crime is weighed against the interest of the defendant in terms of relevancy.

I felt the questions as to whether or not she had a boyfriend who, in fact, used drugs was just so totally irrelevant in the total context of the case, I did in fact sustain that objection, and I did preclude you even though, again, I am satisfied you had evidence there."

For precisely the reasons stated by Judge Chasanow, we agree that his evidentiary ruling in this regard was not an

abuse of discretion. *Fletcher v. State,* 50 Md.App. 349, 437 A.2d 901 (1981).

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.