736 A.2d 307

**Jason Aaron JENSEN**

v.

**STATE of Maryland.**

**No. 138, Sept. Term, 1998.**

Court of Appeals of Maryland.

Aug. 31, 1999.

Geraldine K. Sweeney, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

RAKER, Judge.

The issue we must decide is whether the trial court abused its discretion in restricting the testimony of a character witness called to impeach the credibility of another witness. In resolving this appeal, we must decide whether the excluded testimony was admissible under Maryland Rule 5–608(a)(3), which allows a character witness on direct examination to give a "reasonable basis" for opinion testimony but does not permit a witness to testify as to "specific instances of truthfulness or untruthfulness." We shall hold that the character witness's testimony was improperly restricted, but that the error was harmless. Accordingly, we shall affirm the Court of Special Appeals.

## I.

On June 17, 1996, Jason Aaron Jensen, along with Brian Wooldridge, Jean Nance, and Rachel Whitman, met up with Adrian Pilkington, the victim, at a McDonald's restaurant in Frederick where the victim worked. The group left McDonald's in Pilkington's car and, after spending some time at Whitman's house, traveled to Virginia. On a rural road in Virginia, Pilkington was stabbed twice and placed in the trunk of his car. On the return trip to Frederick, the car, driven by Jensen, stopped on the Route 17 bridge in Brunswick City.

---

* Chasanow, J., now retired, participated in the hearing of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he participated in the decision.

Pilkington, bleeding from his stab wounds but still alive, was taken from the trunk and thrown from the bridge. On June 21, 1996, Pilkington's body was recovered from the Potomac River a few miles from the bridge.

All four were charged with Pilkington's murder. Jensen's trial began on February 4, 1997 and lasted five days. Brian Wooldridge testified for the State pursuant to a plea agreement. The defense called one witness, Melissa Goff, to impeach the credibility of Wooldridge. Portions of her testimony follow.

DEFENSE ATT'Y: Could you tell the jury, if you know, if you're familiar with Brian Wooldridge?

GOFF: Yes, I am.

Q: Okay, and how are you familiar with Brian Wooldridge?

A: I've known him for a while.

Q: You say a while?

A: I guess about a year, even a little longer.

Q: Now, is this a year before this incident or a year up to now?

A: I guess a year before.

Q: And during that particular year, how many times did you meet in a week?

A: I guess once a week.

\* \* \* \* \* \*

Q: Have you ever spoken to Mr. Wooldridge on the phone?

A: Yes, I have.

Q: And how many times have you spoken to him on the phone?

A: I usually speak to him every day.

Q: Okay, and when was that?

A: While he was out of school.

Q: And when was that?

A: I don't remember the exact months.

Q: And for what period of time did you speak to him every day—a week, two weeks, a month?

A: I guess for about a month. Yeah, a month.

Q: Okay, and do you have an opinion as to his veracity to tell the truth?

STATE'S ATT'Y: Objection, Your Honor.

THE COURT: Sustained. Come forward, please, counsel. (Bench conference.)

STATE'S ATT'Y: Insufficient, Your Honor.

THE COURT: Here's what I'm going to do. I am going to excuse the jury, and I am going to conduct—have counsel conduct an examination out of the presence of the jury. I don't believe at this stage you've yet established that basis for her opinion, all right? Thank you.

\* \* \* \* \* \*

(The jury was excused from the courtroom.)

THE COURT: Now, I sustained that objection on the basis that I conclude at this point there's not been an adequate basis for that opinion to be given, but ... I'll give you the opportunity at least to attempt to establish that basis while we're out of the presence of the jury.

\* \* \* \* \* \*

DEFENSE ATT'Y: In general, what would you talk about on the phone during that year that you knew him?

\* \* \* \* \* \*

A: Just things, but he liked to talk about—I guess regular things that kids or normal teenagers would talk about to each other.

Q: Would he tell you inconsistent stories about different things?

A: Yes.

Q: Objection, Your Honor.

THE COURT: Sustained.

\* \* \* \* \* \*

DEFENSE ATT'Y: What basis do you have that Mr. Wooldridge would not tell the truth?

A: A lot of the stories that he told me didn't add up, saying that—one day he would tell me something that happened on that day and then a couple days later he would tell me something else that had happened on that day that wouldn't have been able to happen if what he said before was true.

Q: And this happened once or was that over—

A: This was repeatedly.

\* \* \* \* \* \*

THE COURT: Under the circumstances, it seems to me that testimony given by Ms. Goff supports a basis from the information for her perception of these conversations for giving evidence as to the truthfulness or not of Mr. Wooldridge, and I'm going to allow this course of examination to continue.

\* \* \* \* \* \*

(The jury returned to the courtroom).

\* \* \* \* \* \*

DEFENSE ATT'Y: Do you have an opinion about Mr. Wooldridge's veracity to tell the truth?

A: Yes, um—

Q: What is that opinion?

A. I think that he's a compulsive liar.

Q: What do you base that opinion on?

STATE'S ATT'Y: Objection.

THE COURT: Sustained.

At a second bench conference, defense counsel argued that the jury was entitled to know the basis underlying Goff's opinion, while the State argued both that defense counsel was trying to elicit testimony of specific instances and that defense counsel

had already elicited all the testimony that was contemplated by Rule 5–608(a)(3)(B). The court agreed with the State.

Jensen was convicted of first degree murder, conspiracy to murder, and assault with intent to murder. Jensen appealed his conviction to the Court of Special Appeals. That court affirmed in an unreported opinion. We granted certiorari to consider the following issue:

> Did the Court of Special Appeals misinterpret Maryland Rule 5–608, holding that a character witness could be prevented from giving the basis for her opinion that the State's chief witness was a compulsive liar?

## II.

Petitioner argues that a character witness is permitted to give the basis of his opinion on direct examination, so long as that witness does not cite specific instances of misconduct. Petitioner maintains that without allowing for some evidence of reasonable basis, "a jury will not be impressed with a bald conclusion of personal opinion."

The State argues that reasonable basis evidence properly is limited to how long and under what circumstances the witnesses have been acquainted. The State contends that, "in accordance with common law evidentiary standards," Maryland Rule 5–608 "embodies a restrictive approach designed to avoid diverting the jury's attention and creating mini-trials on the issue of a witness's credibility." According to the State, Goff's proffered testimony was "no more than a number of specific events tied together" and thus contemplated specific instances of conduct prohibited on direct examination under Maryland Rule 5–608(a)(3)(B). The State further argues that any purported error in the evidentiary ruling was harmless beyond a reasonable doubt, given Goff's disparaging assessment of Brian Wooldridge as a "compulsive liar," and given the testimony by two of Jensen's friends and a fellow inmate that he had killed Pilkington.

 

## III.

Maryland Rule 5–608(a)(3)(B) provides:

On direct examination, a character witness may give a reasonable basis for testimony as to reputation or an opinion as to the character of the witness for truthfulness or untruthfulness, but may not testify as to specific instances of truthfulness or untruthfulness by the witness.

We first must determine whether the excluded testimony constituted specific instances of untruthfulness. If we find that the evidence was not specific instances of untruthfulness, we must determine whether the evidence was admissible as a reasonable basis for testimony. Finally, if we determine that the evidence was improperly excluded, we must consider whether the error was harmless.

■ A common understanding of the words "specific instance" indicate that Goff's testimony does not fall into that category. "Specific" is defined as "of an exact or particular nature," "particular," "precise." BLACK'S LAW DICTIONARY 1398 (6th ed.1990). Goff was not testifying as to a particular incident; she was testifying, as a general matter, to Wooldridge's tendency to tell mutually inconsistent stories, *i.e.,* his general tendency to be untruthful. Nor was her testimony "no more than a number of specific events tied together." She was not testifying as to several particular instances of conduct; she was testifying as to a general behavior pattern which was the basis for her opinion that Wooldridge was untruthful. *Cf. Blake v. Cich,* 79 F.R.D. 398, 403 n. 2 (D.Minn. 1978) (applying the Federal counterpart to Maryland Rule 5–608 and explaining, "In one sense, the absence of a criminal record is a record of innumerable specific instances of good conduct. But such a history becomes something more than the specific instances comprising it, it is what is generally meant by good character.")

It becomes even clearer after examining the purposes underlying the prohibition that her testimony was not, as the State classifies the evidence, a string of "specific instances." Maryland's Rule 608(a)(3)(B) is based on Federal Rule of

Evidence 608(b), which in turn is related to Federal Rule of Evidence 405(b) on specific instances evidence. The advisory committee's note to Federal Rule 405 explains that although specific instances are the most convincing character evidence, that type of evidence also "possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." *See also* COURT OF APPEALS OF MARYLAND STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, PROPOSED TITLE 5 OF THE MARYLAND RULES OF PROCEDURE: EVIDENCE § 5–608 Reporter's Note (Subcommittee Draft 1991) (on file with Committee) (explaining that "routinely permitting such proof would distract and unduly influence juries and create too many time-consuming side issues."). As these notes suggest, once a witness testifies to a specific instance, the jury's focus necessarily turns to whether in fact that particular event occurred and the circumstances surrounding that event. In contrast, because Goff's statement that Wooldridge often told her mutually inconsistent stories spoke to a general trait and not to particular occasions on which he lied, it would not serve to distract and confuse the jury, nor would it consume time by altering the focus of the trial to other particular events.

Having decided that Goff's testimony was not evidence of "specific instances," we turn to the more difficult inquiry of whether the trial court abused its discretion in limiting the "reasonable basis" for her testimony to her acquaintance with Wooldridge and her conclusion that Wooldridge was a "compulsive liar." Because Maryland Rule 5–608 must be read in light of Courts & Judicial Proceedings § 9–115, and because the Maryland rules of evidence were "not intended to repeal or supplant the entire common law of evidence," "but only such of it as is inconsistent with the letter or spirit of the rules," *see* 125th Report of the Standing Committee on Rules of Practice and Procedure, 20 Md. Reg. pt. II at P–1 (July 23, 1993) (issue 15), we must understand the phrase "reasonable basis for testimony" in light of the law at the time Rule 5–608(a)(3) was adopted.

Prior to the 1700's in England, a character witness could testify both as to an opinion of a witness's credibility and

specific acts of the witness. *See* 3A J. WIGMORE, EVIDENCE § 979, at 823 (Chadbourn rev.1970). By the mid 1700's, it became settled that, although a witness could be cross-examined about specific or particular acts or courses of conduct, the witness could not testify as to such matters on direct examination. *See id.* The rule further developed that a character witness could testify only as to what he heard from others about the defendant's reputation, and not to his opinion of the witness's truthfulness. *See Taylor v. State*, 278 Md. 150, 155, 360 A.2d 430, 433–34 (1976).

In 1971, the Maryland General Assembly enacted Chapter 760, entitled "AN ACT ... providing that a character witness in any proceeding shall be permitted to give evidence to prove character based on personal opinion." 1971 Maryland Laws ch. 760, at 1634. The current version of this statute provides that:

> [w]here character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State.

Maryland Code (1974, 1998 Repl.Vol.) § 9–115 of the Courts and Judicial Proceedings Article. The statute clearly modified the common law rule insofar as it allowed a witness to testify as to the personal opinion of the truthfulness of another witness. *See Durkin v. State*, 284 Md. 445, 449, 397 A.2d 600, 603 (1979).

This Court interpreted § 9–115 in *Durkin v. State.* In *Durkin*, we addressed whether the trial judge must make a preliminary decision as to the adequate basis for the opinion before permitting the opinion witness to testify. We concluded that "the trial judge has the threshold function of evaluating the circumstances and making a determination that the personal opinion of the character witness is relevant and has

an adequate basis." *Id.* at 453, 397 A.2d at 605. We explained that "the extent of the basis for the personal opinion character testimony relates to admissibility, *and not just to the weight to be given the testimony by the trier of fact.*" *Id.*, 397 A.2d at 605 (emphasis added). Although the issue before the Court related to the trial judge's role under § 9–115, the emphasized portion of the latter statement indicates that "the extent of the basis for the personal opinion character testimony," and not simply the bare opinion itself, is presented for the trier of fact's consideration. Further support is found in *Kelley v. State*, 288 Md. 298, 302, 418 A.2d 217, 219 (1980), wherein we stated that § 9–115 "permits the admission of a broad range of testimony which may aid the jury in assessing the credibility of a witness."

In contrast to the general pronouncements made by this court, the Court of Special Appeals has addressed precisely what is permitted as a basis for opinion testimony under § 9–115. In *Hemingway v. State*, 76 Md.App. 127, 543 A.2d 879 (1988), the Court of Special Appeals interpreted § 9–115 to allow a character witness, on direct examination, to testify as to specific instances bearing on the credibility of the witness to be impeached. In *Hemingway*, the central issue was whether Hemingway had acted in self-defense when he shot and killed the decedent, Hickman. In support of his self-defense argument, Hemingway called a character witness, Lantz, to testify as to Lantz's opinion that Hickman was a violent person. Before trial, the State successfully moved to prevent Lantz from testifying as to any specific acts of violence by Hickman. Lantz was limited to testifying that he was acquainted with Hickman and that Hickman was, in his opinion, a violent person. *See id.* at 131–32, 543 A.2d at 880–81.

The Court of Special Appeals reversed. The court first quoted from Chief Judge Gilbert's opinion for the Court of Special Appeals in *Taylor* [1]:

---

1. In *Taylor v. State*, 28 Md.App. 560, 346 A.2d 718 (1975), *aff'd*, 278 Md. 150, 360 A.2d 430 (1976), the Court of Special Appeals had interpreted § 9–115 to allow a witness to testify as to specific acts

As a result of the enactment of what is now Courts Art. § 9–115, Maryland possesses the common law rule with a vastly broadened field of vision. No longer is a character witness prevented from speaking of specific acts or precluded from demonstrating a basis of knowledge leading to his own independent opinion.

*Id.* at 135, 543 A.2d at 882.

The court then wrote:

Under Md.Code, *supra,* § 9–115 of the Courts and Judicial Proceedings Article, the party who offers the personal opinion of a character witness must first convince the trial judge that the witness possesses an adequate basis for forming an opinion as to another person's character. *Kelley v. State, supra; Durkin v. State, supra.* . . . This does not mean, however, that the basis for the character witness's opinion, if admitted, has no relevance to the weight ascribed to that opinion by the jury. Clearly, the bald conclusion of the witness without any reason to support it hardly commends the opinion for serious consideration by the trier of fact.

*Id.* at 134–35, 543 A.2d at 882.

The court held:

[T]he trial court abused its discretion in restricting Officer Lantz's character witness testimony to the recital of the length of time he had known Randall Hickman and his bald conclusion as to Hickman's reputation for violence. In so ruling, the court deprived the appellant of an ability to urge the jury to credit Lantz's opinion because of the substantial basis for it. . . .

---

contributing to the witness's opinion as to another witness's credibility. This Court affirmed the Court of Special Appeals decision in *Taylor* without reaching the issue of whether § 9–115 permitted such testimony.

... At the retrial, Officer Lantz should be permitted to give his opinion of Randall Hickman's violent character and the bases for his opinion.

*Id.* at 136, 543 A.2d at 883.

It is with this backdrop that we turn to the history underlying the promulgation of Rule 5–608. In 1988, the Standing Committee on Rules of Practice and Procedure began drafting proposed rules of evidence. The task of the committee was to undertake an independent review of Maryland and federal law, not simply to copy the federal rules of evidence. *See* Audio tape of Public Hearing on Proposed Rules of Evidence, held by the Court of Appeals (Oct. 4, 1993) (statement of Judge Alan Wilner, Chair, Standing Committee on Rules of Practice and Procedure) (on file with clerk of this Court). Among the rules considered by the Evidence Subcommittee of the Committee was a rule governing opinion and reputation evidence of character for impeachment purposes. The first proposed rule on this topic mirrored the Federal Rule and provided in relevant part:

(a) Opinion and Reputation Evidence of Character

The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) Specific Instances of Conduct.

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ...

Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Committee Meeting, at 2 (Sept. 9–10, 1988) (on file with the Committee). The Subcommittee

presented the proposed rule to the full committee, which voted not to recommend the rule to the Court of Appeals. *See id.* at 8.

The Subcommittee drafted a different rule in 1991, which provided in section 5–608(a)(3)(B):

> On direct examination, a character witness may give a reasonable basis for testimony as to reputation or an opinion as to the character of the previous witness for truthfulness or untruthfulness, but may not testify to specific instances of truthfulness or untruthfulness by the previous witness.

COURT OF APPEALS STANDING COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, PROPOSED TITLE 5 OF THE MARYLAND RULES OF PROCEDURE: EVIDENCE (Subcommittee Draft 1992) (on file with Committee). That text is identical to the rule ultimately presented to the Court of Appeals with the 125th Report by the Standing Committee on Rules of Practice and Procedure in July of 1993.[2] The Reporter's Note[3] to that final rule read:

> Subsection (a)(3) expresses certain limitations on the character witness's testimony, whether offered as impeachment or rehabilitation. . . . The second sentence *goes beyond the Federal Rule somewhat* by providing that on direct examination, a character witness may give a "reasonable basis"

---

**2.** The rule, omitting the word "previous," was adopted by the Court of Appeals on December 15, 1993, and became effective July 1, 1994. *See* 21 Md. Reg. pt. II at P–1, P–9 (Jan. 7, 1994) (issue 1).

**3.** It must be noted that in its 125th Report, the Rules Committee included its standard admonition:

> Accompanying each proposed rule is a Source Note and a Reporter's Note. *The Reporter's Notes were prepared initially for the benefit of the Rules Committee in its consideration of the rules. They were not debated or approved by the Committee and are not to be regarded as part of the rules or as an official comment on or interpretation of the rules.*

20 Md. Reg. pt. II at P–1 (July 23, 1993) (issue 15). Although we have referenced the Reporter's Notes in many of our opinions, *see, e.g., Holmes v. State,* 350 Md. 412, 423–24, 712 A.2d 554, 559 (1998); *Tuer v. McDonald,* 347 Md. 507, 522, 701 A.2d 1101, 1108 (1997); *State v. Giddens,* 335 Md. 205, 222, 642 A.2d 870, 878 (1994), the notes must be used with this caution in mind.

for testimony as to reputation or an opinion as to truthfulness of the previous witness. The Committee envisions "reasonable basis" evidence as covering such matters as how long the witnesses have been acquainted, under what circumstances, etc. The sentence goes on, however, to express the substance of F.R.Ev. 608(b)(2)—that specific instances of conduct by the previous witness may be inquired into on cross examination of the character witness—as a limitation on direct examination. That provision is inconsistent with *Hemingway v. State,* 76 Md.App. 127, 543 A.2d 879 (1988).

20 Md. Reg. pt. II at P–14 (July 23, 1993) (issue 15) (emphasis added).

An examination of this history makes several things clear. At the time Rule 5–608 was adopted by this Court, various opinions in both this Court and the Court of Special Appeals had interpreted § 9–115 as permitting a broad range of testimony by an impeaching character witness to go before the trier of fact. Rule 5–608 unquestionably intended to modify Maryland law, in particular, *Hemingway v. State,* 76 Md.App. 127, 543 A.2d 879 (1988), to the extent that specific instances of truthfulness or untruthfulness were not admissible on direct examination of a witness. Except for this provision, however, there is no indication that the Rule intended to restrict the latitude previously given to character witnesses in testifying as to the reasons underlying their opinions.

Second, although this Court clearly borrowed from the Federal Rule in adopting the prohibition on specific instances of untruthfulness, the Court did not intend to mimic the Federal Rule in whole. This is made clear by the Committee's choice, after rejecting the Federal Rule in 1988, to redraft the rule and explicitly allow the witness to give a "reasonable basis" for an opinion, and by this Court's ultimate adoption of the redrafted rule; such a provision is absent from the Federal Rule. This is further made clear by the Reporter's Note, which provides that the Maryland Rule *"goes beyond the Federal Rule somewhat* by providing that on direct examination, a character witness may give a 'reasonable basis' for

testimony as to reputation or an opinion as to truthfulness of the previous witness." 20 Md. Reg. pt. II at P–14 (July 23, 1993) (issue 15) (emphasis added).

Put another way, although it is clear that the Court intended to parrot the federal rule with regard to what material *was not permitted* on direct examination of the witness (specific instances of untruthfulness), it is equally clear that the Court intended to "go beyond" the federal rule as to what *was permitted* to go before the trier of fact as the basis for the opinion. Thus, there is little indication that the Federal Rule's limitation on opinion testimony—the witness is generally confined to the nature and extent of observation and acquaintance upon which the opinion is based—should be read as a limit on the Maryland rule.[4] On the contrary, there is strong indication that the Court intended to distinguish the Maryland Rule from the Federal Rule in this area.

In summary, when Rule 5–608 is read in conjunction with Courts & Judicial Proceedings Article § 9–511, which contains no express limitations beyond requiring a witness to have an adequate basis before testifying, the case law interpreting § 9–511, permitting a broad range of testimony, the explicit language of Rule 5–608, allowing for a "reasonable basis" for testimony on direct examination, and Rule 5–608's history, there is no indication that "reasonable basis" was to be restricted to the length and manner of acquaintance. In drafting Rule 5–608, the Rules Committee chose a workable compromise which, while allowing for meaningful opinion testi-

---

4. The Advisory Committee Note to related Federal Rule 405 provides:
   The express allowance of inquiry into specific instances of conduct on cross-examination in subdivision (a) and the express allowance of it as part of a case in chief when character is actually in issue in subdivision (b) contemplate that testimony of specific instances is not generally permissible on the direct examination of an ordinary opinion witness to character. Similarly as to witnesses to the character of witnesses under Rule 608(b). *Opinion testimony on direct in these situations ought in general to correspond to reputation testimony as now given, i.e., be confined to the nature and extent of observation and acquaintance upon which the opinion is based. See Rule 701.*
   FED.R.EVID. 405 advisory committee's note (emphasis added).

mony, does not transform trials into a series of separate mini-trials. It is fair to infer from the Rule and its history that the committee felt that a character witness was entitled to some latitude in informing the jury as to the basis for an opinion, so long as that person avoids venturing into the troublesome area of specific instances. Permitting such latitude allows the witness, within reason, to offer something to the jury beyond a bare conclusion that the witness "is a truthful person" or "is not a truthful person."[5] Accordingly, we hold that the trial court abused its discretion in restricting Goff's testimony to a description of her acquaintance with Wooldridge and her conclusion that he was a "compulsive liar."[6]

## IV.

We now turn to whether the error in excluding portions of Goff's testimony was harmless. Under *Dorsey v.*

---

5. A trial judge is permitted to exclude evidence that is irrelevant, unfairly prejudicial, or cumulative under Rule 5–403. The trial judge did not exclude the evidence on these grounds, but on an erroneous interpretation of Rule 5–608.

6. Though it is not clear exactly what material the trial judge relied on in interpreting Rule 5–608, the trial court's ruling in this case is understandable when viewed in light of seemingly contradictory provisions in the Reporter's Note. The Reporter's Note provides that Maryland's rule "goes beyond the Federal Rule somewhat," and also states that "[t]he Committee envisions 'reasonable basis' evidence as covering such matters as how long the witnesses have been acquainted, under what circumstances, etc." 20 Md. Reg. pt. II at P–14 (July 23, 1993) (issue 15). This latter provision, at first glance, seems to mirror, and not to go beyond, the Federal Rule.

As previously noted, the Reporter's Notes are not to be regarded as an official interpretation of the rules. Further, the two provisions can be read consistently. The Federal Rule advisory committee's note provides that opinion testimony ought in general to "be confined to the nature and extent of observation and acquaintance upon which the opinion is based." Fed.R.Evid. 405 advisory committee's note. The Maryland Reporter's Note provides that "[t]he Committee envisions 'reasonable basis' evidence as covering such matters as how long the witnesses have been acquainted, under what circumstances, etc." 20 Md. Reg. pt. II at P–14 (July 23, 1993) (issue 15). The federal note clearly contains the more restrictive language. The federal note's language is restrictive, while the Maryland note's language is illustrative.

*State,* 276 Md. 638, 659, 350 A.2d 665, 678 (1976), we must determine whether, upon our independent review of the record, we can declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict. The evidence in this case convinces us that the *Dorsey* standard for harmlessness has been met in this case.

The excluded testimony was relatively insignificant. Goff's testimony was that "[a] lot of the stories that he told me didn't add up, saying that—one day he would tell me something that happened on that day and then a couple days later he would tell me something else that had happened on that day that wouldn't have been able to happen if what he said before was true" and that this happened repeatedly. While, as our discussion above indicates, we do not suggest that this testimony did not provide some further basis to her opinion, given Goff's statement that Wooldridge was a "compulsive liar," the defense's vigorous cross-examination of Wooldridge concerning his arrangement with the State in exchange for his testimony, and the fact that Jensen's trial occurred over the course of five days, we can say beyond a reasonable doubt that this testimony would not have influenced the jury's verdict.

At trial, the medical examiner, Dr. Margarita Korell, testified that Pilkington had suffered two stab wounds to his back. One had perforated the chest wall and entered the lower lobe of the left lung and the other had entered the right lobe of the liver. Dr. Korell also testified that Pilkington's body showed evidence of drowning.

Melissa Gentry, appearing on behalf of the State, testified that several days prior to the murder, she had been in a parking lot with Jensen and Pilkington. She stated that she and Pilkington "were horsing around and he said fuck you to me." She testified that Pilkington was "just joking." She stated that Jensen "got mad" and got out of the car in which he was seated and "wanted to fight" Pilkington. Gentry testified that Jensen said that "it was disrespect to a girl. And then he was saying he would kill him." Jensen tried to get Pilkington out of the car in which he was seated, at which

point Gentry and two others "helped get him back into his car and get him to settle down." When Gentry returned to the car where Jensen was sitting, he was "still angry" with Pilkington and "stayed mad" for "about ten minutes."

James Teneyck, testifying for the State, stated that on the night of the murder, he accompanied Jensen to McDonald's. He testified that Jensen had said "that there was somebody who worked there named Adrian Pilkington and that he wanted to beat him up because he thought Adrian was a punk." Teneyck further testified that

[h]e wanted to make Adrian believe that everything was okay between them, because they had had some arguments previously in the past. And he wanted to make Adrian think that it was okay, and then get Adrian to take he, Jason and Brian and Jean and Rachel somewhere, and they were planning to beat Adrian up and take his car and his weed.

After they entered McDonald's, Teneyck overheard "a conversation of Jason mending things with Adrian and saying are we cool, and saying don't worry about it, I don't have anything against you, and things like that." Teneyck testified that when they exited McDonald's, Jensen told Teneyck, "that stupid mother fucker thinks we're okay." [7]

Steven Simmons also testified for the State. He stated that he had been with Jensen on June 17th, and that Jensen had come back from making a phone call and, referring to a man, said he "was going to kill that mother fucker." Later that evening, in the parking lot of McDonald's, Simmons testified that "Brian [Wooldridge], Jean [Nance] and Jason [Jensen] were talking about beating him up for messing with a girl." Jensen, referring to Pilkington, "was like, I'll pulverize him into the concrete." Simmons also testified that before going into McDonald's, Jensen said "I'm going to be buddy-buddy with him, so he won't think anything is up." Jason went

---

7. Teneyck also testified that Jensen said, "I really want to kill him now." On redirect examination, Teneyck admitted to some doubt that it was Jensen who made the statement that he wanted to kill Pilkington.

inside McDonald's and said to Pilkington "he was sorry about what happened that night in the parking lot. Adrian was like don't worry about it, you know, it's over. So they shook hands." Simmons also testified that "Jason had pulled me up to the side and asked me do you want to help me kill him, and I was like no. I said if you all are going to do that you all do that on your own."

On cross-examination, Simmons conceded that he told Detective Melissa Oland that Wooldridge was the one who threatened to pound Pilkington's head in the cement, and explained:

Well first Jason [Jensen] was the one that had made the first statement, Brian [Wooldridge] was the one that had followed up on it. So he had, I guess, he had asked them if they were with it. They came up with these little things like beating his face in, chopping him on his head, stomping him, whatnot.

Frederick County Police Officer Joseph Chris Carroll testified as to events occurring after Pilkington was thrown from the bridge. He stated that he pulled over a vehicle, later identified as Pilkington's, at approximately 2:00 a.m.[8] Jensen was driving the vehicle, and Nance and Rachel Whitman were passengers. Jensen did not produce either a driver's license or vehicle registration, and falsely identified himself. The officer noticed what appeared to be smears of blood on the outside of the vehicle, on the door frame on the inside of the door, and on the center console area in between the two front seats. He observed a flannel shirt jacket on the driver's seat back, which, upon closer inspection, was marked with what appeared to be stains of blood or dried blood. When he removed the shirt, the officer observed what appeared to be stains of blood on the driver's seat back. He recovered a buck knife in a sheath in a white plastic bag from the rear of the vehicle, which he retained. Jensen told the officer that he had

---

8. He pulled over the vehicle because the passenger side tail light was dim and the vehicle was traveling in a left turn lane and failed to make a left turn.

run over a dog, used the knife to cut the dog's throat, wrapped the carcass in the shirt, and then threw the carcass over a bridge. Jensen told the police that the car belonged to a friend.

On cross-examination, Carroll testified that Whitman admitted to ownership of the plastic bag containing the knife. Carroll also testified that "[o]n [Jensen's] right forearm area there was, appeared to be scrapes on his arm there, they appeared fresh, as if they had just stopped bleeding." Jensen told Officer Carroll that he had received the injuries when shadow boxing with Nance.

The jury was presented with two versions of events occurring that evening. One account was given by Brian Wooldridge, who testified on behalf of the State pursuant to a plea agreement. Jensen's account of events was introduced at trial via a lengthy statement made to several Frederick County detectives that was placed into evidence by the State.

Wooldridge testified that, after the group left Whitman's house, Pilkington, following Jensen's instructions, drove to Virginia and stopped the car in a dark, rural area. Jensen and Pilkington exited the car and began walking toward a house. They then U-turned and walked back to the car. Wooldridge heard a noise. When Wooldridge exited the car and walked to the back of the car, he saw Pilkington "kind of down on the ground and Jensen standing with a knife." Pilkington "was having serious trouble breathing, all you could hear, he was . . . he was trying to breathe." According to Wooldridge, Jensen grabbed Pilkington, pulled him up and stabbed him again. When asked whether Jensen said anything before Jensen stabbed Pilkington, Wooldridge responded, "He smiled."

Wooldridge testified that he tried to help Pilkington, and Jensen asked him "what the fuck [he] was doing." Wooldridge responded that he was going to help Pilkington, to which Jensen responded "no you're not." When Wooldridge went to put Pilkington in the car, he "got shoved into the car" and "the door was pushed shut" onto his leg. Jensen told

Pilkington "get the fuck in the car and don't get out." Jensen had the knife in his hand at the time. Jensen and Nance then dragged Pilkington to the back of the car. When Wooldridge again exited the car and tried to help Pilkington, Jensen came at him with the knife and told him to get in the car or he was going to stab him. Wooldridge got back in the car and saw the trunk go up, felt a weight hit the car, and saw the trunk lid shut. Jensen then drove the car and stopped on a bridge. Jensen and Nance exited the car, and after a moment, Wooldridge exited the car. Jensen and Nance had taken Pilkington out of the car, and Pilkington was laying on the ground barely breathing, making gurgling, choking noises, and slightly moving, "as if he was trying to get up but he couldn't." When Jensen realized Wooldridge was outside the car, he told him to "get in the car right now or I'll stab you and throw you off this bridge with him." When Wooldridge did not get in the car, Jensen stepped forward with the knife, at which point Wooldridge got in the car. After sitting in the car two to three minutes, Wooldridge heard a splash, shortly after which Jensen and Nance came running around to the car. He also testified that when they were on the bridge, Nance and Jensen were wearing rubber gloves. Jensen then proceeded to drive toward Frederick. Wooldridge testified that the car stopped near a store, at which point "John [Nance] and Rachel [Whitman] and Jason [Jensen] were out of the car, they were cleaning off, they took socks off, wiping down the trunk, and the car and everything, getting the blood off it, there was blood all over the car." Wooldridge was told "if you tell anybody what happened I'll kill you." Later that morning, Jensen called Wooldridge and told him that they had been pulled over by city police who had found the knife and bloody clothes. Jensen told him that "they were going to run away" and that they wanted him to come with them. After Wooldridge declined, Jensen told him that "if he told or anything happened" Jensen would kill Wooldridge and anybody that he cared about. Wooldridge also testified that in exchange for his testimony, he was subject to a maximum of 15 years in the Division of Correction for his plea of conspiracy to commit

first degree murder. On cross-examination, the following exchange took place:

Q: So you're saying that ... you had nothing to do with the knifing ... of Adrian?

A: No I did not.

Q: Okay, then in that case why did you plead guilty?

A: I didn't plead guilty.

Q: Okay, explain to me what you did.

A: I was told there was a slight chance I could get convicted if I went to trial. I would admit I was scared to take that chance. I didn't have nothing to do with the killing of my friend. I was taking a chance going to prison for the rest of my life for a crime I didn't commit, or I could take this deal, plead not guilty, settle for a 15 year cap, possibly, even likely I could do up to 15 years. But in the meantime I will get out. And I can help my friend now seeing I wasn't brave enough to do it then.

Q: But isn't it true that you didn't plead not guilty but you pled to a charge that you felt that the State had enough evidence to prove you guilty?

A: Yes, conspiracy.

In Jensen's statement, Jensen admitted to stabbing Pilkington one time, but stated that it was accidental and that he acted in self-defense. In his statement to police, Jensen testified that he, Nance, Whitman, and Wooldridge had planned to go "cruising" with Pilkington after Pilkington finished work at McDonald's. According to Jensen, they drove to Virginia where Pilkington parked on a deserted road and exited the car; he then directed Jensen to exit the car. The others followed. Jensen became concerned when he noticed that everyone had rubber gloves. He stated that he was scared because Wooldridge removed a knife from the trunk of the car, and he thought he was going to be killed. Jensen stated that Wooldridge threw the knife on the ground. Jensen turned back to walk back to the car, when Pilkington picked up the knife, came toward Jensen, and tackled him. Jensen "thought [he] was gonna die" when Pilkington came at

him with a knife, so he grabbed the knife and just stabbed Pilkington in the shoulder. Jensen testified that he stabbed Pilkington one time, because he was afraid that he would be killed if he did not protect himself. He also stated that "I had no part in trying to rob this dude. I didn't even know him. And when I stabbed him, it was just straight self defense. I didn't try to kill nobody, man."

Gwen Marie Kurtz, Jensen's girlfriend at the time of the offense, also testified on behalf of the State. Kurtz testified that when she arrived home from work on the morning of June 18th, Jensen and Nance were at her home. Jensen was crying, and told Kurtz that "they all really screwed up." She stated that "[h]e said that him and a couple of friends went out and they ended up killing a guy. . . . Killing a kid. And then he got traffic tickets. He caught a ride with somebody and he came to my house." She asked him who it was, and he identified Adrian Pilkington. When asked whether Jensen had ever made comments to her about whether the killing was planned, she responded, "He said that they had all gotten into a fight. And that when they went back to Rachel's [Whitman's] house they figured he and Adrian would stay in the living room and they would go get a knife, they'd take a ride and kill him." Jensen told her that the knife came from Whitman's kitchen. She did not know if he had told her whether or not he had actually stabbed Pilkington, but did say that "they threw him over a bridge into . . . the river." She also testified that Jensen and Nance wanted her to cash her paychecks and go with them to either Chicago or Arizona.

On cross-examination, Kurtz stated that Jensen had told her that Pilkington was trying to kill him, and that Jensen had told her that Wooldridge had a gun. These statements were made to Kurtz not when Jensen was at Kurtz's house but later, when Jensen was in jail.

Bradley Eugene Fritz testified that on June 19, 1996, "Jason told me that he did something real, real bad, eventually he broke down and told me that he killed somebody." He told him that "he stabbed the person through the shoulder and

then through the lungs." Fritz testified that Jensen "wanted me to come and get him and Jean [Nance] that night and get them to a bus station or when I had time to come get them and get them out of town." Jensen also asked Fritz for Jensen's cousin's number in Arizona. Fritz also testified that Jensen told him "it felt good to kill someone."

Martin Howard Shepley, an inmate at the Frederick County Detention Center, testified to a conversation he overheard between Jensen and other inmates. He stated, "I remember him telling [another inmate] that he stabbed Adrian and that there was a lot of blood everywhere. And that they should have gotten rid of the car and that they should have covered up their tracks better."

Finally, correctional officer Annette Frahm testified that while Jensen was incarcerated, she overheard him talking in a loud voice. She testified that "[Jensen] and another inmate were speaking about playing football and making tackles. Suddenly that conversation turned to Mr. Jensen making tackles and stabbing a person." She also testified that "[Jensen] specifically said when I was tackling him and stabbed him, he continued to fight, but he would not get up from the stab wound." At that point Frahm told Jensen that "for his safety, he should not be talking about his case."

To summarize, Jensen admits to stabbing Pilkington once, but claims that this stabbing was done in self-defense. He also claims that he had nothing to do with the second stabbing or with throwing Pilkington over the bridge. The evidence demonstrates that prior to the killing, Jensen was angry with Pilkington, pretended to befriend him, and told several other people that he wanted to either hurt or kill Pilkington. Following the killing, he was pulled over in Pilkington's blood-covered car and gave a false explanation to the police. Four individuals testified that Jensen told them, or that they overheard him, either revealing the details or bragging about the killing. Several individuals testified as to his plans to flee. Taken as a whole, even without Brian Wooldridge's testimony, Jensen's explanation that the first stabbing of Pilkington was

in self-defense simply flies in the face of the evidence. The error was harmless beyond a reasonable doubt.

*JUDGMENT AFFIRMED WITH COSTS.*

BELL, C.J., and ELDRIDGE, J., dissent.

CHASANOW, J., concurs and dissents.

BELL, Chief Judge, dissenting.

Today, the Court holds that the trial court abused its discretion, and thus erred, when it restricted the testimony of the character witness, Melissa Goff, called by Jason Aaron Jensen, the petitioner, to impeach the testimony of State's witness Brian Wooldridge, but that the error was harmless. Accordingly, it, like the Court of Special Appeals, affirms the petitioner's murder conviction. I agree that the trial court erred. I do not agree that the error was harmless.

The majority's interpretation of Maryland Rule 5–608 [1] is careful and well reasoned. It takes into account the wording of the rule, its difference from the federal rule, from which it emanated, the history of its promulgation and its relationship to Maryland Code (1974, 1998 Replacement Volume), § 9–115 of the Courts and Judicial Proceedings Article. [2] The majority's analysis makes clear that the term, "reasonable basis," as used in Rule 5–608, contemplated something more than a

---

**1.** At issue in this case is the limitation on character witnesses contained in section (a)(3)(B) of the rule:

> "On direct examination, a character witness may give a reasonable basis for testimony as to reputation or an opinion as to the character of the witness for truthfulness or untruthfulness, but may not testify to specific instances of truthfulness or untruthfulness by the witness."

**2.** Maryland Code (1974, 1998 Replacement Volume), § 9–115 of the Courts and Judicial Proceedings Article provides:

> "Where character evidence is otherwise relevant to the proceeding, no person offered as a character witness who has an adequate basis for forming an opinion as to another person's character shall hereafter be excluded from giving evidence based on personal opinion to prove character, either in person or by deposition, in any suit, action or proceeding, civil or criminal, in any court or before any judge, or jury of the State."

recitation by the character witness of his or her "length and manner of acquaintance" the witness whose testimony is being impeached. It makes a strong case not only for its conclusion that "[i]n drafting Rule 5–608, the Rules Committee chose a workable compromise which, while allowing for meaningful opinion testimony, does not transform trials into a series of separate mini-trials," 355 Md. at 707–08, 736 A.2d at 315 (1999), but for concluding that this Court, in adopting the rule, intended the character witness to have "some latitude in informing the jury as to the basis for an opinion, so long as that person avoids venturing into the troublesome area of specific instances" of truthfulness or untruthfulness. *See id.*

A critical issue in *Rubin v. State,* 325 Md. 552, 602 A.2d 677 (1992) was harmless error. Unlike this case, evidence had been erroneously admitted, so the inquiry was the effect of its admission on the verdict, while, here, the question is whether its admission would have made a difference. Nevertheless, what I said in dissent in that case is relevant to this case and bears repeating:

> "Following a thorough review of our cases and those of the Supreme Court which addressed the issue, this Court, in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), enunciated the test of harmless error which controls the resolution of this case:
>
> ' ... When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict. (footnote omitted)'
>
> "*Id.* at 659, 350 A.2d at 678. The test focuses on the effect of erroneously admitted, or excluded, evidence on the verdict rendered by the jury. Once it has been determined

that error was committed, reversal is required unless the error did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility, 'beyond a reasonable doubt.'

"We also made clear that the test of harmless error is supposed to be strict; indeed, it ' "has been and should be carefully circumscribed." ' *Younie v. State,* 272 Md. 233, 248, 322 A.2d 211, 219 (1974). In that case, quoting *People v. Jablonski,* 38 Mich.App. 33, 195 N.W.2d 777, 780 (1972), we pointed out:

' "Continued expansion of the harmless error rule will merely encourage prosecutors to get such testimony in, since they know that, they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal."

"272 Md. at 248, 322 A.2d at 219.

"Where the evidence remaining after excluding errone-ously admitted evidence is insufficient to sustain the convic-tion, the error can never be harmless. Similarly, if the questioned evidence goes to an important issue in the case, especially if credibility is central to the resolution of the case, the error in admitting that evidence is likewise not harmless. This is the case because it is the trier of fact, in this case, the jury, not an appellate court, that must find the facts and resolve credibility issues. Therefore, what ap-pears, on the cold record, to be an insurmountable case for the State, when viewed from the jury's perspective, having seen it unfold through live witnesses, in the dramatic atmo-sphere of the courtroom, may be quite a close case or result in a defense verdict. How, or why, a jury may decide to resolve credibility or fact issues in a particular manner is a matter only it knows. One thing is certain, the jury is

under no obligation to decide any case consistently with what is, objectively, the strongest case.

\* \* \* \*

"No matter how strong a case for conviction the State may present, even when the defense presents no evidence, the court may not direct a verdict for the State. *See* Maryland Rule 4–324, which, while providing that a defendant may move for judgment of acquittal, Rule 4–324(a), and the court may direct the entry of judgment in his or her favor if there is insufficient evidence, as a matter of law, Rule 4–324(b), makes no provision for the making of a motion for judgment by the State. Compare Maryland Rule 2–519, the civil counterpart. *Lyles v. State [State v. Lyles]*, 308 Md. 129, 135, 517 A.2d 761, 764 (1986). This is so because it is the trier of fact, whether the court or a jury, that must determine if the State has met its burden of proof. To make that determination, the trier of fact is required to find the facts and when, as is usually the case, there are credibility issues, to resolve them. That, in turn, involves weighing the evidence. Appellate courts do not find facts or weigh evidence, 'what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury ... to determine.' *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260–61 (1990). *See Gore v. State,* 309 Md. 203, 214, 522 A.2d 1338 (1987); *Wilson v. State,* 261 Md. 551, 566, 276 A.2d 214, 221 (1971); *Jacobs v. State,* 238 Md. 648, 650, 210 A.2d 722, 723–24 (1965). Even when an appellate court assesses the sufficiency of the evidence, it does not weigh it, *see Clemson v. Butler Aviation–Friendship,* 266 Md. 666, 671, 296 A.2d 419, 422 (1972); *Gray v. Director, Patuxent Institution,* 245 Md. 80, 84, 224 A.2d 879, 881 (1966), it only determines if any evidence exists, on the basis of which a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 573 (1979); *Bloodsworth v. State,* 307 Md.

164, 167, 512 A.2d 1056, 1057 (1986). There is no reason that a harmless error analysis should permit it to do more."

325 Md. at 592–94, 596–97, 602 A.2d at 696–97, 698–99.

As in *Rubin*, the majority declares that it can say beyond a reasonable doubt that the excluded testimony would not have affected the jury's verdict. Boiled down to its essence, its basis is:

> "The excluded testimony was relatively insignificant. Goff's testimony was that 'A lot of the stories that he told me didn't add up, saying that—one day he would tell me something that happened on that day and then a couple days later he would tell me something else that had happened on that day that wouldn't have been able to happen if what he said before was true' and that this happened repeatedly. While we do not suggest that this testimony did not provide some further basis to her opinion, . . . given Goff's statement that Wooldridge was a 'compulsive liar,' the defense's vigorous cross-examination of Wooldridge concerning his arrangement with the State in exchange for his testimony, and the fact that Jensen's trial occurred over the course of five days, we can say beyond a reasonable doubt that this testimony would not have influenced the jury's verdict."

355 Md. at 709, 736 A.2d at 316.

It is, to be sure, undoubtedly true, as the majority also points out that the State's case is much stronger than the petitioner's. Indeed, that is to be expected; after all, it is the State that has the burden of proof and all the petitioner has to do is to create a reasonable doubt in the mind of the trier of fact. The majority is not the trier of fact, yet it has weighed the evidence—note its characterization of the excluded testimony—and substituted its judgment for that of the jury. When it weighs evidence, an appellate court usurps the function of the jury. In this case, the usurpation of the jury function has occurred after holding that the jury was deprived of relevant evidence favorable to the petitioner, evidence that

explained the character witness's reason for testifying that the State's main witness was a liar.

Explaining why one calls another a "compulsive liar" is, to my mind, quite important and, in this case, may have been, and most likely would have been, viewed by the jury as more than "relatively insignificant." To call a person a "compulsive liar" is but to state a conclusion; telling the jury what you mean by compulsive liar or why you have drawn that conclusion is more persuasive and, to a trier of fact, has more value in the decision-making process. In any event, whether that explanation was important or not, or its effect on the jury, is a matter that the jury should have been allowed to determine in the first instance.

The majority concludes its opinion with the following statement: "Taken as a whole, even without Brian Wooldridge's testimony, Jensen's explanation that the first stabbing of Pilkington was in self defense simply flies in the face of the evidence." 355 Md. at 716–17, 736 A.2d at 320. From this, it appears that, like the *Rubin* majority, the majority is also construing the *Dorsey* test as permitting harmless error to be determined on an "otherwise sufficient" basis: if the evidence is sufficient without the improper evidence, *i.e.*, the jury could have convicted the defendant without it, so harm could not have resulted. *See Ross v. State,* 276 Md. 664, 674, 350 A.2d 680, 686–7 (1976). In any event, whether intended or not, there is a real danger that it will be so construed in future cases.

The application of the *Dorsey* test in this case is nothing more than unwarranted expansion of the harmless error rule. As I have said on a number of prior occasions, that is something that should not be condoned by this Court. I dissent.

Judge ELDRIDGE joins in the views expressed herein.

CHASANOW, Judge, concurring and dissenting.

I concur with the majority that Jason Jensen's convictions should be affirmed, but I disagree with the majority's conclu-

sion that the trial judge abused his discretion in restricting the testimony of a character witness who stated that a material state's witness was a "compulsive liar." Although a qualified witness may testify to another witness's bad reputation or character for truthfulness, the witness should not be permitted to add an indication of a psychological defect such as "pathological" or "compulsive." If, as in the instant case, the character witness blurts out an improper character trait, the witness should not be permitted to explain how the improperly expressed opinion was arrived at.

Since the trier of fact has only a brief opportunity to observe a witness and little basis for making critical judgments about a witness's veracity, we allow impeachment of a witness by evidence of the witness's character or reputation for untruthfulness, but we try to do so in a manner that minimizes the inflammatory nature of this evidence. One way we limit this character for untruthfulness testimony is by circumscribing the character trait. We do not allow veracity character impeachment by testimony that the witness is immoral or corrupt; we limit the character impeachment to "untruthfulness." *See* Maryland Rule 5–608(a)(1), which provides in pertinent part:

> "In order to attack the credibility of a witness, a character witness may testify (A) that the witness has a reputation for untruthfulness, or (B) that, in the character witness's opinion, the witness is an untruthful person."

*See also* 1 John W. Strong, McCormick on Evidence § 43, at 157 (4 th ed.1992), noting that the relevant character trait is limited to bad character for truth and veracity. There is an obvious difference between an untruthful person and a person who has an uncontrollable compulsion to lie. Wester's Third New International Dictionary 468 (1986) defines "compulsive" as "having power to compel . . . exercising or applying compulsion . . . produced or caused by compulsion . . . of, having to do with, caused by, or suggestive of psychological compulsion or obsession." When the character witness went beyond the permissible testimony concerning truthfulness and added the inference of an irresistible or uncontrollable need to

lie, the trial judge did not abuse his discretion in refusing to allow the witness to express a basis for this improperly volunteered opinion. *Cf. Clark v. State*, 332 Md. 77, 629 A.2d 1239 (1993). Having volunteered an improper opinion bordering on a psychological diagnosis, the witness should not be permitted to reinforce her testimony by expressing how she arrived at the opinion.

In addition to the trial judge being entitled to restrict testimony about the basis for an improperly expressed opinion, the majority seems to fail to recognize a vital distinction in the application of Md. Rule 5–608(a)(3)(B). It is quite clear that the rule is intended to allow the character witness to express the reasonable basis for arriving at an opinion, not the reasonable basis for the opinion arrived at. The relevant provision of Md. Rule 5–608 is:

"(3) Limitations on character witness's testimony

\*       \*       \*

(B) On direct examination, a character witness may give a reasonable basis for testimony as to reputation or an opinion as to the character of the witness for truthfulness or untruthfulness, but may not testify to specific instances of truthfulness or untruthfulness by the witness."

Professor McLain, one of the Reporters for the Evidence Subcommittee that drafted the evidence rules, explains the rule in her book MARYLAND RULES OF EVIDENCE:

"The second sentence of subsection (a)(3) provides that, on direct examination, a character witness may give a 'reasonable basis' for testimony as to (1) the reputation for truthfulness of, or (2) the character witness's opinion as to the truthfulness of, the principal witness. But the Rule goes on to adopt the substance of Fed.R.Evid. 608(b)(2)— that specific instances of conduct by the principal witness may be inquired into *on cross-examination* of the character witness—as a limitation on direct examination. The Rule overrules *Hemingway v. State*, 76 Md.App. 127, 543 A.2d 879 (1988), insofar as that decision permitted (indeed, required) a character witness to state on direct the specific

acts of the other witness that had led the character witness to form his or her opinion.

A 'reasonable basis' for reputation testimony under the Rule, therefore, would be that the character witness and the other witness have both been members of a particular community for a certain period of time, and that the character witness had heard of the other witness's reputation there.

Similarly, a 'reasonable basis' for opinion testimony would be how long and under what circumstances the character witness knows the other witness, *e.g.*, they have worked side by side on the assembly line for ten years and they eat lunch together every workday. *See* Fed.R.Evid. 608, Advisory Committee's note ('[T]estimony of specific instances is not generally permissible on the direct examination of an ordinary opinion witness to character. * * * Opinion testimony on direct ... ought in general to correspond to reputation testimony as now given, *i.e.*, be confined to the nature and extent of observation and acquaintance upon which the opinion is based.'); 3 Weinstein & Berger, Weinstein's Evidence ¶ 608[03] at 608–24 and ¶ 608[04] at 608–27 (1993)." (Citations omitted)(emphasis supplied).

Lynn McLain, Maryland Rules of Evidence § 2.608.4, at 149 (1994 ed.).

In order for a character witness to testify about the untruthful character or bad reputation for truthfulness of another witness, the character witness should establish a basis of knowledge. This is a predicate to the admissibility of the reputation or character for truthfulness and this is what Md. Rule 5–608(a)(3)(B) refers to when it allows the "reasonable basis for testimony as to reputation or an opinion as to the character of the witness for truthfulness or untruthfulness...." This permissible testimony concerns how long and under what circumstances the character witness knew the primary witness, or how often and under what circumstances the character witness discussed the reputation of the primary witness. This permissible testimony about the basis of knowledge for the opinion or reputation of untruthfulness is far

different from testimony concerning specific instances of untruthfulness that is prohibited by the rule.

In the instant case, the testimony at issue was that "[a] lot of the stories that he told me didn't add up" and "one day he would tell me something that happened on that day and then a couple days later he would tell me something [absolutely inconsistent with the first version]." This testimony is far more analogous to the prohibited specific acts of untruthfulness than to the permissible basis for knowledge of the witness's character. I do not believe the trial judge abused his discretion in prohibiting this testimony.