*Michael Geoffrey Jamsa v. State of Maryland*, No. 1012, September Term, 2019. Opinion by Salmon, James P., J.

**CRIMINAL PROCEDURE — QUANTITATIVE TESTING — MARYLAND RULE 4-263(d)(9):** The opportunity to inspect, copy and photograph all . . . tangible things that the State's Attorney intends to use at a hearing or at trial, implies the defendant's right to have independent testing performed on the item to be used as evidence against him.

Circuit Court for Montgomery County
Case No. 133877C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1012

September Term, 2019

_____

MICHAEL GEOFFREY JAMSA

v.

STATE OF MARYLAND

_____

Berger,
Wells,
Salmon, James P.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Salmon, J.
_____

Filed:  October 28, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

This case had its origin on March 27, 2018, when Montgomery County police officers charged Michael Geoffrey Jamsa ("Jamsa" or "appellant") with second-degree assault, altering evidence, and possession of a controlled substance (cocaine) with intent to distribute. After Jamsa's arrest, the Montgomery County police laboratory examined 5.93 grams of a white powdery substance that had been found, at the time of his arrest, in the back seat of Jamsa's vehicle. The laboratory concluded that the white powdery substance contained cocaine. The laboratory, however, did not make a quantitative analysis to determine the percentage of cocaine in the white powdery substance.

Jamsa, by counsel, filed a motion to suppress all evidence seized by the Montgomery County police at the time of his arrest. After a hearing, that motion was denied.

On December 4, 2018, Jamsa entered a plea of guilty to Count Three of the indictment, which charged him with possession with intent to distribute cocaine. Subsequently, however, the circuit court allowed Jamsa to withdraw that guilty plea.

On February 21, 2019, which was approximately two months before the assigned trial date, Jamsa's counsel filed a motion for appropriate relief. Movant asked the circuit court to order the State to allow Jamsa, at his own expense, to have the white powdery substance analyzed at a Pennsylvania laboratory to determine the percentage of cocaine in the substance (quantitative testing) that was seized. Counsel asserted that Jamsa had "a good faith basis to believe" that the majority of the substance in question was not cocaine. A hearing on that motion was held on March 1, 2019, but the motions judge denied Jamsa's motion for appropriate relief.

The case was tried before a jury, in a trial that commenced on April 24, 2019. At the conclusion of the State's case, the court granted Jamsa's motion for judgment of acquittal as to second-degree assault. The jury convicted Jamsa, however, of the remaining two charges, namely, altering evidence and possession of a controlled dangerous substance (cocaine) with intent to distribute. Jamsa was sentenced to three years for destruction of evidence, and a concurrent term of thirty years, all but ten years suspended, in favor of a five-year period of probation for possession with intent to distribute cocaine.

In this timely appeal, appellant raises three questions, which we have slightly rephrased:

1. Did the circuit court abuse its discretion when it refused appellant's request to independently test the alleged narcotics that formed the basis of appellant's conviction?

2. Did the circuit court abuse its discretion when it permitted the State to introduce evidence that appellant invoked his right to counsel during an interrogation?

3. Did the circuit court err when it denied appellant's Motion to Suppress?

We shall answer the first two questions presented in the affirmative and the third question in the negative, vacate Jamsa's convictions and remand the case to the Circuit Court for Montgomery County for a new trial.

## BACKGROUND FACTS

### A. The Suppression Hearing

**1. Testimony of Montgomery County Police Officers**

On March 27, 2018, Detective ("Det.") Kevin Morris, with the Montgomery County Police Department, was conducting undercover surveillance of the parking lot of a shopping center located at the intersection of Layhill Road and Bel Pre Road in Montgomery County. The parking lot that was under surveillance was in a high crime area where Det. Morris had conducted multiple narcotic investigations in the past.

In the early evening hours of March 27, 2018, Det. Morris saw a truck ("the truck") pull into the "drive through area" of a BB&T bank; the truck parked there for several minutes. At one point, the driver of the truck briefly got out of the vehicle but never used the ATM machine.

Detective Morris next saw a man ("the pedestrian") walk from the shopping center toward the truck. The driver of the truck then moved his vehicle towards the back of the BB&T bank. The detective reacted by repositioning his vehicle and saw the pedestrian lean into the passenger's side window of the truck. Detective Morris saw "that there was some kind of exchange" between the pedestrian and the driver of the truck, and also saw that the two were communicating, but he could not see any money, drugs or any other item being exchanged. The pedestrian stayed there approximately fifteen seconds, then walked away. The truck also left. At that point, Det. Morris believed that he had witnessed a

possible drug transaction, which caused him to radio members of his team so that they could assist in making a traffic stop of the truck.

One of the members of Det. Morris's team was Montgomery County Detective Artemis Goode. He observed the truck travelling north on Georgia Avenue and began following it. Detective Goode saw the truck stop for a red light and then saw it take off "at a high rate of speed" after the light turned green. The detective paced the truck's speed by positioning his vehicle parallel to the truck in the adjacent lane. While pacing the truck in this manner, Det. Goode testified that his speedometer showed that his vehicle and the truck next to him were traveling 46 mph in a 40 mph zone.

Detective Goode testified that he had been trained in proper pacing techniques but admitted that his vehicle speedometer had not been calibrated or certified for two years. He also admitted that the Montgomery County police department has a regulation that requires speedometers to be calibrated once a year.

After Det. Goode determined that the driver of the truck had committed a traffic violation, Det. Morris and the rest of the team prepared to effectuate a traffic stop of the truck. Montgomery County police officer Daniel Ford, who was positioned behind the truck in an unmarked vehicle, turned on his vehicle's lights and siren, and Det. Goode, who had maneuvered his vehicle in front of the truck, turned on the lights and sirens on his vehicle as well. The truck changed lanes as if to pass Det. Goode's car but instead, struck its rear bumper. Detective Goode and the truck then jockeyed for position momentarily before the truck pulled to the side of the road and stopped.

4

Detectives Goode and Morris approached the truck and issued commands for the driver to roll down the driver's side window. The driver of the truck, who was later identified as Jamsa, not only refused to roll down the window but was observed reaching down towards the truck's console. When Jamsa reached down, Det. Goode drew his service weapon. Both detectives testified that they next saw Jamsa rip open a "brown tannish bag," and dump the contents into a Dunkin Donuts cup. Fearing that Jamsa was destroying evidence, Det. Morris attempted to break the truck's window. While he was doing this, Jamsa pulled out a second "whiteish colored plastic bag" and began "ripping it open and dumping" it into the same cup. Jamsa then placed the white bag into the cup, rolled down the window, and threw the cup and its contents at Det. Goode. The contents of the cup spilled onto Det. Goode who knocked the cup back into Jamsa's truck, spilling water on the floor of that vehicle.

Jamsa was then yanked from the vehicle and placed under arrest. After Jamsa had been arrested, he attempted to "stomp" on his cell phone.

Jamsa's truck was searched. In the backseat, the police found a shirt and in a shirt pocket they found a bag containing a white powdery substance, which the police believed to be cocaine.

At the suppression hearing, Jamsa's counsel argued that prior to the stop of appellant's truck, the police had neither probable cause nor even a reasonable articulable suspicion that Jamsa had committed any crime or traffic violation. According to defense counsel, because neither probable cause nor a reasonable articulable suspicion was shown,

the police had no right to make the traffic stop; and, in the absence of the right to make the stop, the fruits of that stop, namely the cocaine and cell phone, should be suppressed.

The State countered that based on what Det. Morris observed in the parking lot of the shopping center, he had probable cause to believe that Jamsa had engaged in a drug transaction with the pedestrian. The State argued in the alternative, that prior to the stop of Jamsa's truck, the police had probable cause to believe, or at least a reasonable articulable suspicion, that Jamsa had violated the Maryland traffic laws by driving 46 mph in a 40 mph zone.

The motions judge agreed with the State and found that the police, prior to the stop of Jamsa's truck had: 1) probable cause to believe that he had engaged in the sale of drugs; 2) in the alternative, the police had probable cause, or at least a reasonable articulable suspicion, to justify the stop of his vehicle based on the fact that Jamsa was driving six miles per hour over the speed limit.

## II.

### THE MOTION FOR APPROPRIATE RELIEF

Jamsa's written motion for appropriate relief made four main assertions, namely:

- That the Montgomery County Police Crime Laboratory tested the substance [found in Jamsa's truck] and indicated that it tested positive for cocaine. The [d]efendant requested [that the] County [p]olice [l]ab test the substance in question to determine the percentage of actual cocaine versus a non-controlled substance. The [p]olice [l]ab indicated they could not perform purity or quantitative testing, but that the substance could be sent to a lab [NMS Laboratories] in Pennsylvania for this type of analysis.

- That Assistant State's Attorney Aaron Ramirez investigated the logistical issues involved in sending the substance to NMS Laboratories in Pennsylvania. On November 14, 2018 Mr. Ramirez proposed an agreement

6

to the [d]efendant's previous attorney regarding shipping substances to NMS Laboratories. The agreement covered costs, (to be paid by the [d]efendant), chain of custody issues, use of the test results and stipulations should the substance be lost or damaged during shipping.

- That for reasons unknown to [present defense counsel], the [d]efendant's previous attorney did not pursue the quantitative testing after the State proposed an agreement on November 14, 2018.

- That the [d]efendant will agree to all stipulations that the State has proposed in order for the quantitative testing to occur.

Defense counsel also stated that the State had changed its position and "would no longer agree to the quantitative testing without a court order."

At the hearing on the motion for appropriate relief, the prosecutor told the court that the chemist who performed the test on the powdery substance found in a pocket of appellant's shirt was Troy Oliver. He then explained that at the Montgomery County lab, testing for cocaine is done in two phases. The prosecutor continued:

They started with what they call a presumptive test which is a color test. You take a sample and it's supposed to turn a certain color if it tests positive for cocaine or whatever the chemical composition is.

Already in the discovery that I provided which is [in] the bench file - - everything that the chemist should have written down - - shows that that initial test was negative. And so that's something that the [d]efense is more - - you know can make hay with all day that this initial test came back negative.

THE COURT: So even though it's negative you then go to the assessment?

[The Prosecutor]: You go to the GCMS [Gas Chromatography Mass Spectrometry] because the GCMS gets down into the like the atoms if you will. And I'm obviously not a chemist so I'm not explaining this artfully but gets into the actual chemical compound composition of what's really in here. So that a sample was submitted into the machine through a mixture that the lab creates using a sample and whatever dilutants they have to ready the substance. And that test[] came back positive. And this is the words of the

7

chemist as I understand them - - Mr. Oliver - - is that [the] first test was weak. Again[,] that's something that the [d]efense is free to cross[-]examine him on. There was . . . a second test done injecting more sample into the machine and it came back positive and normal. Now just for the sake of sort of non-scientists I said well what does it mean that you conducted more sample?

He . . . injected more microliters. And I said well, is a microliter that you initially injected into the machine visible to the naked eye? And he said no. There's no way you can see a microliter that was initially injected into the machine. And I said what about the second sample that was then injected into the machine? He was like you can't see that one either. So[,] we're talking about something that is microscopic[ally] present and the defense has that information available to them.

They are free to cross-examine the State's expert on that. But all of this goes back to what Your Honor said during the first phase of this argument which is okay. So what if we're dealing with .001 percent? And the answer is - - the response is yes. So what? Because the jury instructions tell us there is no magic number that we're looking for. We're looking for presence or absence and then all of the surrounding circumstances.

THE COURT: Excuse me. Excuse me. I want [defense counsel] to respond to that.

At the hearing, Jamsa's counsel admitted that if the laboratory test showed only a trace amount of cocaine, that would not mean that the State had insufficient evidence to present a jury issue as to whether his client possessed cocaine with intent to distribute. Instead, defense counsel's contention was that: 1) his client had a good faith belief that the substance was cornstarch with only a slight amount of cocaine; and 2) that if it could be proven that the substance tested contained only a very small percentage of cocaine, that proof would be relevant inasmuch as it might help persuade a jury that Jamsa did not have an intent to distribute cocaine.

8

The State's position was simple and categorical: it was irrelevant as to what percentage of cocaine was in the white powdery substance that was examined by the chemist.

During the course of the hearing, the motions judge made it clear that he agreed with the State's view that no matter what the out-of-state quantitative test showed, it would not be relevant.

At the hearing, there was a significant amount of discussion concerning the logistics of sending the white powdery substance out-of-state to be tested. There was no concern expressed about the reliability of the lab located in Pennsylvania. In fact, NMS Laboratories had been used by the Montgomery County State's Attorney's office on previous occasions. The concern was about what would happen if the material sent to the lab was lost or for some reason could not be returned.

Defense counsel's position was that the logistical aspects had been worked out when the prosecutor sent Jamsa's first attorney a list of proposed stipulations. Jamsa's first attorney did not reply to the proposed stipulations but when Jamsa's new counsel contacted the prosecutor, defense counsel said that he would agree to all the proposed stipulations. According to defense counsel, once he agreed to all the proposed stipulations, the prosecutor said that he would talk to his supervisor because of "all the logistical problems[.]" The prosecutor later advised defense counsel that he would not consent to any out-of-state testing. According to the prosecutor, his logistical concerns were as follows:

[W]e're talking about sending a controlled dangerous substance through the postal system which could be interdicted by federal, postal, local, state in Pennsylvania. So[,] we can't guarantee that the substance through that method will arrive or return to us in a satisfactory manner for presentation at trial.

In reply, Jamsa's attorney argued that it was the State that located the laboratory in Pennsylvania and that:

[A]ll of these things that he's talking about logistically have already been stipulated to. We've talked about what happens if the drugs get damaged, if they get lost. Those stipulations won't be affected if the case goes to trial. So logistically [the prosecutor] did a boatload of back work on this already. . . . So that already exists. . . . So essentially what I'm hearing is [members of the State's Attorney's office] just don't feel like doing it.

Defense counsel added that if the State was genuinely concerned about material going through the post office or evidence getting lost or damaged, those matters had already been agreed upon by stipulation.

The motions judge then asked defense counsel if one of his stipulations was that if the package containing the evidence was "completely lost" that the defendant would concede that it contained cocaine and that he wouldn't be able to make the argument that there had been a failure to test. Jamsa's counsel answered that question in the affirmative. The motions judge ruled in favor of the State saying:

[Defense Counsel], you make it interesting. I enjoyed the discussion[,] but I have too many concerns about evidence leaving the control of the State at this time. It's not an element of the offense as I understand it. And I hear what you're saying but I'm concerned how it would benefit the defendant as well but that's your call. That's not my call. I just find that interesting. So given those concerns and the State not agreeing[,] the motion for appropriate relief is denied.

## III.

## THE TRIAL

At trial, the evidence as to how Jamsa came to be stopped by the police was in all material respects the same as that presented at the suppression hearing.

The State called Montgomery County Police Sergeant ("Sgt.") Gregory Chmiel to testify concerning his interview with Jamsa that occurred approximately two and one-half hours after Jamsa's arrest. That interview was recorded in its entirety.

Prior to Sgt. Chmiel's testimony, the court was advised that the State intended to introduce "clips" of pertinent parts of the interview with Jamsa while Sgt. Chmiel was on the stand. After Sgt. Chmiel was sworn in and had commenced his testimony, defense counsel approached the bench and made a motion *in limine*. The subject of the motion concerned the last "clip" that recorded what was said just before the termination of the interview when Jamsa said, "I'm not talking. You're not listening to me. I'm asserting my right to counsel." The "clip" also showed that after Jamsa invoked his right to counsel and to remain silent, Sgt. Chmiel said: "well, okay, now that you've invoked the right to counsel[,] I'm going to terminate the interview and you can stop answering any questions." Defense counsel objected to any statement by his client or Sgt. Chmiel indicating that appellant had invoked his right to counsel. Defense counsel argued that it was inappropriate for the jury to hear Jamsa's invocation of the right to counsel because that could be interpreted by the jury as an indication that his client was going to get a lawyer because he was guilty. Defense counsel also objected to introduction of the part of the statement where Jamsa said in essence, "I'm not talking."

11

The prosecutor contended that it was "permissible" and "also necessary" for the jury to hear the part of the tape to which Jamsa objected because the prosecutor "didn't want the jury to get the impression that the defendant asserted a right that wasn't respected." The trial judge overruled the objection.

Immediately thereafter, the prosecutor and Sgt. Chmiel engaged in an exchange concerning what transpired during the interview. Sergeant Chmiel testified that he advised Jamsa of his *Miranda* rights and Jamsa waived them. This was confirmed by the introduction into evidence of a *Miranda* waiver form, which Jamsa signed. In the interview, Jamsa denied throwing any liquid at Det. Goode. Also, Jamsa said that the white powdery substance found in his shirt in the back of his truck was cornstarch. When Sgt. Chmiel asked Jamsa if he would be surprised if he learned that the substance on the cup found in the vehicle contained cocaine residue, Jamsa said he would be surprised because he didn't have any cocaine. Jamsa also denied destroying evidence.

When Sgt. Chmiel got to the segment of the tape where Jamsa invoked his right to counsel and to remain silent, defense counsel did not repeat his objection.

Montgomery County Det. James Walsh was accepted by the court as an expert in the field of "drug trafficking and distribution." He identified for the jury several features of the case that he found significant. Regarding a text message recovered from Jamsa's phone, Det. Walsh noted an exchange between Jamsa and a contact who was listed as "Quiet George." According to Det. Walsh, that conversation was consistent with the interpretation that appellant and Quiet George were engaged in drug activity.

12

Detective Walsh also testified that drug users often purchased two to three grams of cocaine at the most, but low-level cocaine dealers may sell 3.5 to 4 grams of substance at a time. He further testified that cocaine is often packaged in plastic baggies or ripped baggies that are tied in knots and are about a thumbnail in size. The detective found "significant" that the bags found in appellant's jacket contained 5.93 grams of a substance that tested positive for cocaine. According to Det. Walsh, typically cocaine is sold in tenths of a gram and therefore "nearly six grams is in [his] opinion, training, and experience[,] consistent with distribution rather than just possessing it for use." He further opined that the "purity" of the sample would not affect his opinion because "it's either an illicit substance or it's not" and the drug trafficker's decision to "adulterate a product" might affect the drug dealer's retention rate, but was not something he considered as a police officer.

At trial, Tony Oliver, the police chemist, testified that the two torn baggies and the cup confiscated from appellant's truck all tested positive for the presence of cocaine residue. Mr. Oliver said that he could not visually determine whether the 5.93 grams was cocaine and he admitted that his initial presumptive tests were negative for the presence of cocaine or heroin. But, when Mr. Oliver utilized the laboratory's gas chromatography mass spectrometry, he determined the presence of cocaine. He explained that he conducted only "qualitative" testing and could only "determine the presence or absence of a substance" but not the "amount" of the substance present. He said that the gas chromatography mass spectrometry device is "incredibly sensitive" and that a particle of cocaine smaller than a grain of sand could result in a positive test. Because of the sensitivity of the test, Mr. Oliver

13

admitted that a positive result could occur simply because someone touched cocaine and then touched another substance or surface. He also admitted that the substance he examined could contain less than 1% cocaine.

## IV.

## DISCUSSION

### A. <u>The Right to Quantitative Testing</u>

Maryland Rule 4-263 obligates the State's Attorney to provide a defendant with "[t]he opportunity to inspect, copy, and photograph all documents . . . or other tangible things that the State's Attorney intends to use at a hearing or at trial[.]" Maryland Rule 4-263(d)(9). Implicit in this rule "is the right of a defendant, subject to an appropriate protective order, to have independent testing performed on the [item] that is to be used as evidence against him." *Mangum v. State*, 342 Md. 392, 401 (1996) (interpreting Md. Rule 4-263(b)(5), an earlier version of Md. Rule 4-263(d)(9)).

The State and the appellant appear to be in agreement that a defendant has a right to have independent testing of evidence to be used against the defendant so long as the testing is relevant to some issue in the case. In the words of the State, "[w]hile a defendant may seek independent testing to determine, for instance, whether cocaine is present in a substance, he is not automatically entitled to conduct additional testing (not done by the State) regarding matters that are not germane to the charges against him." Thus, the main issue that separates the parties, is whether the proposed out-of-state testing was germane to the question of whether appellant possessed cocaine with the intent to distribute it.

14

In support of his contention that the proposed out-of-state testing was relevant, Jamsa first points to the elements that the State was required to prove in order to convict him of possession of cocaine with the intent to distribute. Those elements are: "(1) 'the defendant knowingly possessed the substance'; (2) 'the defendant knew the general character or illicit nature of the substance'; and (3) 'the substance was cocaine.'" *See also Dawkins v. State*, 313 Md. 638, 651-52 (1988). Appellant contends that quantitative testing "may have provided [a]ppellant the ability to challenge whether he had the requisite knowledge of the substance's illicit character." In that regard, he points to testimony by the chemist in this case, Mr. Oliver, who said that the testing device he used would result in a positive test even if the cocaine in the sample amounted to "less than a grain of sand." Jamsa argues that if the independent testing confirmed the presence of only trace amounts of cocaine, so small as to be undetectable by the senses, the jury would have been permitted to draw the conclusion that the State had not met its burden of proving that appellant was aware of the illicit nature of the item.

Additionally, in order to show the relevance of the proposed testing, appellant points to a jury instruction that was given in this case. Regarding the charge of possession with intent to distribute, the jury was told that for the defendant to be found guilty, the jury must find:

> . . . that the defendant possessed cocaine with the intent to distribute some or all of it. Distribute means to sell, exchange or transfer possession of the substance or to give it away. No specific quantity is required for you to find the intent to distribute. There is no specific amount below which the intent to distribute disappears and there is no specific amount above which the intent to distribute appears. You may consider the quantity of the controlled dangerous substance, along with all other circumstances, in determining

15

<u>whether the defendant intended to distribute the controlled dangerous substance</u>.

(Emphasis added.) *See also* Maryland Pattern Jury Instruction – Cr. 4.24.1.

According to appellant, even if the jury determined that he knew the substance contained cocaine, if it were determined by an independent laboratory test that the white powdery substance contained only a trace amount of cocaine, a reasonable juror, who had been instructed that he or she could consider the quantity of the cocaine, might conclude that there was so little cocaine in the white powdery substance that the defendant did not intend to distribute it.

Additionally, appellant argues:

Testimony regarding the amount of cocaine present in the sample was important to ensuring an accurate factual picture. Throughout the trial, the State represented that [a]ppellant was in possession of 5.93 grams of "cocaine." Relying upon the quantity possessed, the State's expert suggested that the evidence was consistent with low-level drug dealing, and not personal use. Such inferences were, of course, permissible. *Purnell v. State*, 171 Md. App. 582, 613 (2006). The difficulty, however, is that while the State's position was legally accurate, it was potentially factually misleading. Whether the substance contained a measurable amount of cocaine or only trace amounts, was relevant to assessing the strength of the State's assertion that the quantity provided sufficient evidence of an intent to distribute.

Additionally, appellant points out that in two cases, appellate courts in Maryland, have indicated that the purity of the controlled dangerous substance is relevant. Appellant first cites *Harris v. State*, 324 Md. 490, 492-93 (1991). In *Harris*, the Court summarized the State's evidence, which the Court said, "would have supported, but which did not compel, a finding that the defendant possessed the cocaine with the intent to distribute it." *Id*. at 492. According to the Court's summary of the evidence supporting a finding of the

16

requisite intent, was a showing that the cocaine was 70% pure and that drug "traffickers usually dealt in cocaine having a high purity." *Id.*

In *Anaweck v. State*, 63 Md. App. 239 (1985), Judge Moylan, speaking for this Court, said, "[t]here was in the present case, to be sure, some evidence of an intent to sell arising from the <u>purity</u> and <u>quality</u> of the cocaine, the quantity of the cocaine, and the method of packaging." *Id.* at 255 (emphasis added). Appellant argues that if the quality of the cocaine can be an indicator of intent to distribute then, by parity of reasoning, when the quality of cocaine is low, or a trace amount, the lack of an intent to distribute can be inferred.

In this Court, as in the circuit court, the State relies on the legal principles enunciated in *Collins v. State*, 89 Md. App. 273, 279 (1991), *viz.*:

> In Maryland, no specific quantity of drugs has been delineated that distinguishes between a quantity from which one can infer [intent] and a quantity from which one cannot make such an inference.

*See also Johnson v. State,* 142 Md. App. 172, 204 (2002). According to the State, these cases "demonstrate that the information sought by Jamsa . . . was ultimately irrelevant to the question of whether he possessed the drugs with the intent to distribute."

In regard to the *Anaweck v. State* and *Harris v. State* cases, which are relied upon by Jamsa, the State argues that these cases "demonstrate that the purity level of cocaine, by itself, has never been a dispositive factor in Maryland law. The totality of the circumstances, rather than the quality or quantity of the drugs alone, are dispositive in determining intent to distribute."

17

The State also relies on two out-of-state cases to buttress this position. The first case relied upon is *Barksdale v. Commonwealth*, 522 S.E.2d 388 (Va.Ct.App. 1999). Barksdale was an indigent defendant charged with possession of cocaine with intent to distribute. *Id*. at 389. His attorney filed a motion for an order requiring the Commonwealth of Virginia to provide and pay for a quantitative analysis of the substance alleged by the Commonwealth to be cocaine. *Id*. Under Virginia law, an indigent defendant who seeks independent testing by an expert witness at the expense of the Commonwealth, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense, and that he will be prejudiced by the lack of expert assistance[,]" and may result "in a fundamentally unfair trial." *Husske v. Commonwealth*, 476 S.E.2d 920, 925 (1996) (the accused must show a "particularized need" for such expertise and, that "[m]ere hope or suspicion that favorable evidence is available is not enough to require that such help be provided.").

In *Barksdale*, defense counsel told the motions court that he "believe[d]" that a quantitative analysis of the contraband would "precisely quantify the cocaine, apart from any cutting agent, evidence which he speculates would negate any inference of an intent to distribute based upon gross weight." *Barksdale*, 522 S.E.2d at 390. Significantly, at the motions hearing in *Barksdale*, defense counsel told the motions judge that he was "rolling the dice here" when asking for testimony by an expert. *Id*. The *Barksdale* Court held that the record failed to demonstrate a particularized need for the requested expertise but, instead, merely showed defendant's "hope that the evidence would promote his defense." *Id*. The *Barksdale* majority concluded that such "conjecture, lacking substance, did not

implicate defendant's fundamental right to a fair trial" and therefore, the trial court properly denied the motion. *Id*. at 390-91.

The State also relies on *McCray v. State*, 519 So.2d 1376 (Ala.Crim.App. 1988). The defendant in the *McCray* case was found in possession of 29.0 grams of cocaine. *Id*. at 1377. The section of the Alabama code, which the defendant was accused of violating, provided that any "person . . . who is knowingly in actual or constructive possession of, 28 grams or more of cocaine or any mixture containing cocaine, . . . is guilty of a felony, which felony shall be known as 'trafficking in cocaine.'" Alabama Code 1975, § 20-2-80(2) (emphasis added). The defendant, in *McCray*, contended that the State of Alabama was required to quantitatively analyze the cocaine to determine the percentage of pure cocaine in the 29 grams that he possessed. *Id*. The *McCray* Court rejected the defendant's contention and held that under the applicable statute, "the State is not required to prove that the accused possessed 28 grams or more of pure cocaine." *Id*. (quotation marks and citation omitted).

Neither the *Barksdale* nor *McCray* case is useful in determining whether the trial judge should have allowed testing in the subject case. Here, Jamsa was not indigent and was not asking the State to provide him with free testing. More importantly, in *Barksdale*, defense counsel did not demonstrate a "particularized need" for the appointment of an expert, as the Virginia statute required; instead defense counsel admitted that he was just "rolling the dice." 522 S.E.2d at 390. In other words, the defense attorney was just "hoping" that testing might prove useful. In contrast, in the subject case, defense counsel represented to the court that his client had a "good-faith" belief that testing would show

19

only a trace amount of cocaine in the 5.93 grams of white powdery substance that the State chemist examined.

The *McCray* case is also distinguishable because the Alabama law that the defendant was accused of violating barred possession of <u>any</u> <u>mixture</u> containing cocaine that weighed 28 grams or more. In contrast, under Maryland statute, "no specific quantity of drugs has been delineated that distinguishes between a quantity from which one can infer [intent] and a quantity from which one cannot make such an inference." *Collins*, *supra*, 89 Md. App. at 279.

We agree with Jamsa's argument that if the quantitative analysis showed that the white powdery substance contained only a trace amount, or a very small amount, of cocaine, this <u>could</u> be relevant to the jury's determination of whether appellant even knew that the white powdery substance contained cocaine. After all, the State's chemist said you could get a positive result if someone touched cocaine and then touched the white powdery substance he analyzed. Moreover, even if the jury determined that Jamsa knew that the white powdery substance contained traces of cocaine, the small quantity could be a factor that the jury might consider in determining whether he had the powdery substance for his own personal use or for sale or distribution.

We agree with appellant that if under Maryland precedent, the purity of cocaine can be used to infer an intent to distribute, proof that the powdery substance contained only trace amounts of cocaine could support the opposite inference. We hold that the appellant, who expressed a good faith belief that the powdery substance only contained a small

20

amount of cocaine, had a right to have the material independently tested – at his own expense.

We recognize that one of the reasons the motions judge denied the motion for appropriate relief that Jamsa sought was that he was concerned about the fact that the State's evidence would have to be tested in Pennsylvania, because no Maryland laboratory performed tests for purity. But on the record before us, there does not appear to be any valid reason for those concerns because the State had previously insisted that Jamsa agreed to certain proposed stipulations that would protect the State, and Jamsa's attorney agreed to all of those stipulations. Under such circumstances, any chance that the State might be harmed by the out-of-state testing appears to be non-existent.

Lastly, the State argues that even if the denial of testing was erroneous, appellant was not prejudiced by the ruling. The State points out, accurately, that at trial, defense counsel was able to cross-examine the chemist, Troy Oliver, and through that cross-examination established that it was possible that the material examined only qualitatively contained only a trace amount of cocaine. But this does not show that any error was harmless beyond a reasonable doubt. We say this because, as any trial lawyer knows, there's a great deal of difference between proving that something is "possible" and proving that it is a "fact."

The State also argues, that any error was harmless because at trial, the "State's argument . . . never rested on the purity level of the cocaine." That, of course, is true. Instead, the State relied on the testimony of its expert that 3.5 to 4.0 grams of cocaine would be consistent with lower level drug dealing and that cornstarch is a common cutting agent.

The State's argument, at trial, may have been a strong one. But, arguably at least, the inference that appellant intended to distribute the white powdery substance may have been undercut if the jury knew that the substance contained only a trace amount of cocaine.

For the above reasons, we reject the State's harmless error argument and vacate appellant's conviction for possession of cocaine with intent to distribute and remand the case to the Circuit Court for Montgomery County for a new trial as to that count. Upon remand, the court shall sign an order to allow quantitative testing in compliance with the various stipulations previously insisted upon by the State.

## B. Invocation of Right to Counsel and to Remain Silent

Jamsa argues that the trial judge committed reversible error when he allowed the State to introduce testimony that Jamsa had invoked his right to counsel and to remain silent during a police interview. He argues, citing *Grier v. State*, 351 Md. 241 (1998), that in Maryland, evidence that a defendant invoked his right to silence or to seek counsel, is inadmissible due to both its low probative value and the great risk of unfair prejudice. In *Grier*, the Court of Appeals said:

> Evidence of post-arrest silence, after *Miranda* warnings are given, is inadmissible for any purpose, including impeachment. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *Miranda v. Arizona*, 384 U.S. 436, 468 n.37 (1966). As a constitutional matter, allowing such evidence "would be fundamentally unfair and a deprivation of due process." *Doyle*, 426 U.S. at 618. As an evidentiary matter, such evidence is also inadmissible. *Younie v. State*, 272 Md. 233, 244 (1974); *Miller v. State*, 231 Md. 215, 218-19 (1963). When a defendant is silent following *Miranda* warnings, he may be acting merely upon his right to remain silent. *Younie*, 272 Md. at 244; *Miller*, 231 Md. at 218-19. Thus, a defendant's silence at that point carries little or no probative value, and a significant potential for prejudice. *United States v. Hale*, 422 U.S. 171, 180 (1975).

22

351 Md. at 258.

Testimony regarding evidence that a defendant, post-*Miranda* warnings, invoked his or her right to counsel, generates the same concern as the invocation of the right to silence. *Harris v. State*, 458 Md. 370, 415-16 (2018).

In this case, the jury heard, on the tape, appellant being advised of his *Miranda* rights. They were also allowed to hear the portion of the tape where appellant said that he refused to talk anymore and invoked his right to an attorney. The State argues that the issue of whether the trial judge erred in allowing the testimony that appellant invoked his right to silence and asked for a lawyer was not preserved for review. The State stresses that although defense counsel made a motion *in limine* to preclude this testimony, defense counsel failed to object at the time that the evidence was introduced. In support of that argument, the State cites, among other cases, *Ellerba v. State*, 41 Md. App. 712, 725 (1979), for the proposition that "[i]t is fundamental that, irrespective of the disposition of an original objection, a subsequent failure to object to the same evidence introduced through the same or different witnesses waives the error on appeal."

The portion of the *Ellerba* case just quoted, accurately sets forth the general rule. There is, however, an exception to that rule that was expressed and later applied in the case of *Watson v. State*, 311 Md. 370 (1988). The defendant, in *Watson*, filed a motion *in limine* asking the Court to rule that his 1982 Virginia attempted rape conviction and a prior theft conviction, could not be used to impeach him. *Id.* at 372-73 n.1. The trial judge denied the motion *in limine* and when the defendant testified at trial, the prosecutor impeached the defendant through the use of his prior convictions. *Id.* The *Watson* Court held that despite

23

defendant's failure to object during the prosecutor's cross-examination, the objection to that court's ruling in the motion *in limine* was sufficient to preserve his objection to the use of the prior convictions. *Id*. The *Watson* Court explained that the trial judge had made his ruling immediately before the defendant was cross-examined and, therefore, requiring defendant to object once again would have been futile and would have "exalt[ed] form over substance." *Id*. The Court, in *Clemons v. State*, 392 Md. 339, 362-63 (2006), relying on *Watson*, reached a similar result.

The rule set forth in *Watson* and *Clemons*, however, is a narrow one and applies only when the prior ruling by the court (here, the motion *in limine*) is in close proximity to the point where the offending evidence was introduced. *See Norton v. State*, 217 Md. App. 388, 396 (2014), *aff'd*, 443 Md. 517 (2015) (deciding "[i]n light of the close temporal proximity between the trial court's ruling on the motion *in limine* and [witness's] testimony" that appellant's objection to an expert witness, despite a failure by appellant's counsel to later object, was preserved for review).

Here, the rule set forth in *Watson* and *Clemons* is applicable. The trial judge's ruling on the motion *in limine* was made immediately before Sgt. Chmiel's testimony. Under such circumstances, it would have been an exercise in futility to require defense counsel to reiterate his objection inasmuch as it had so recently been overruled.

The State argues, in the alternative, that the trial judge did not err in admitting testimony that appellant, after he had been given his *Miranda* rights, invoked his right to counsel and to remain silent. According to the State, that evidence was admissible to rebut the appellant's claim that his statement to the police was not voluntary.

24

At the point where the trial judge ruled on the motion *in limine*, defense counsel had not made any claim that the statement was not voluntary although counsel did make such a claim when counsel and the court were discussing proposed jury instructions. During those discussions, the prosecutor indicated that he did not believe the issue of voluntariness had been generated. Defense counsel responded that:

> I do think here you've got a situation where some of the statements admitted were prior to being advised to his right to an attorney. Others were after. So, I think it is certainly something the jury should consider and will be instructed on that they can consider that as a factor.

After the prosecutor argued that the roadside comment turned out not to be a custodial "statement" within the meaning of the *Miranda* rule, defense counsel said "and that may all be true. I don't think that's any reason not to include it in the instructions. I think it is appropriate here given the circumstances." Later, at defense counsel's request, the trial judge gave the jury an instruction concerning the issue of voluntariness. That instruction was, in substance, the same as set forth in Md. Pattern Jury Instructions – Cr. 3:18.

In its brief, the State puts forth no convincing argument in support of its claim that the evidence in question was admissible to show that appellant's statement to the police was voluntary. If the offending evidence had not been admitted, the State's position that appellant's post-*Miranda* statement was voluntary would not have been weakened in any respect.

The State argues, in the alternative, that admission into evidence of the fact that appellant had invoked his right to an attorney and a right to silence was harmless beyond a

reasonable doubt due to the strength of the State's case. The State's case was strong, but not overwhelming and the State's harmless error argument does not give sufficient weight to the highly prejudicial nature of the evidence here at issue. As this Court said in *Zemo v. State*, 101 Md. App. 303, 316 (1994) "[i]t is a common lay perception that those who won't talk frequently have something to hide." Also, as the Court of Appeals said in *Coleman v. State*, 434 Md. 320, 333 (2013), quoting *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the right to remain silent as embodied by the Fifth and Fourteenth Amendments, comes with an implicit "assurance" that silence "will carry no penalty." The reason that post-*Miranda* silence, or post-*Miranda* invocation of the right to counsel, are inadmissible for any purpose is that "'[a]s a constitutional matter, allowing such evidence would be fundamentally unfair and a deprivation of due process.'" *Id.* (quoting *Grier*, 351 Md. at 258). Also, as the Court stated in *Coleman*, evidence of post-*Miranda* silence "'is so egregious and so inherently prejudicial, reversal is the norm rather than the exception.'" 434 Md. at 345 (quoting *Alston v. Garrison*, 720 F.2d 812, 817 (4th Cir. 1983)). For the above reasons, we reject the State's argument that allowance of testimony indicating that appellant had invoked his right to counsel and his right to silence was harmless beyond a reasonable doubt. Therefore, appellant's conviction for destruction of evidence shall be vacated and the case remanded to the Circuit Court for Montgomery County for a new trial as to that count.

## C.     The Stop of the Truck Jamsa Was Driving

As mentioned, in the circuit court, appellant argued that the police, at the time they stopped his truck, had neither probable cause nor even a reasonable articulable suspicion

26

that he had committed any crime. In the brief submitted by appellant and the State, there is considerable discussion as to whether Det. Morris had probable cause to believe, based on what he saw in the parking lot near the BB&T bank, that appellant had just sold drugs to the pedestrian who approached his truck. The motions judge, as mentioned earlier, found that based on all of the circumstances, Det. Morris did have probable cause to believe that he had witnessed a drug transaction. In this appeal, however, it is not necessary for us to decide whether the motions judge erred in this regard because the motions judge also found, in the alternative, that the police had, at a minimum, a reasonable articulable suspicion that appellant had violated the Maryland traffic law by driving 46 mph in a 40 mph zone.

"Reasonable suspicion exists somewhere between unparticularized suspicions and probable cause." *Sizer v. State*, 456 Md. 350, 364 (2017). To justify a traffic stop under the Fourth Amendment, an officer is required to have reasonable suspicion, which is defined as "'a particularized and objective basis for suspecting the particular person stopped' of breaking the law." *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Navarette v. California*, 572 U.S. 393, 396 (2014)).

Detective Goode's belief that appellant was exceeding the posted speed limit was based on two factors: First, he pulled his vehicle alongside of appellant's truck and drove at the same speed as the truck. Secondly, while pacing the speed of the truck driven by appellant, Det. Goode looked at his speedometer and it showed that both vehicles were travelling at 46 mph. Those two factors certainly gave Det. Goode a reasonable articulable suspicion that appellant had exceeded the 40 mile per hour speed limit.

27

It is true, as appellant stresses, that the speedometer in Det. Goode's car had not been calibrated in two years even though Montgomery County regulations call for speedometers of police vehicles to be calibrated once every year. But, as the motions judge pointed out, the issue in the case was not whether the State had proven beyond a reasonable doubt that Jamsa's truck was going 6 mph over the speed limit. In the motion judge's view, if that were the issue, the State would not have met its burden. By contrast, when all the State needed to show was that Det. Goode had a "particularized and objective basis for suspecting" that appellant was exceeding the speed limit, the evidence was sufficient to meet such a low threshold.

For the above reasons, we affirm the motions judge's denial of the motion to suppress the evidence seized immediately after Jamsa's truck was stopped.

**JUDGMENTS VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL WITH INSTRUCTIONS FOR THE CIRCUIT COURT TO PASS AN ORDER (1) ALLOWING APPELLANT TO OBTAIN QUANTITATIVE TESTING OF MATERIAL ALLEGED TO BE COCAINE; AND (2) PROVIDE IN THE ORDER THAT THE MATERIAL TO BE TESTED SHALL BE RELEASED TO APPELLANT IN ACCORDANCE WITH THE SAFEGUARDS AND STIPULATIONS PREVIOUSLY AGREED TO BY THE STATE. COSTS TO BE PAID 25% BY APPELLANT AND 75% BY MONTGOMERY COUNTY.**